CHEVRON PHILLIPS CHEMICAL COMPANY LP and Exxon Land Development, Inc., Appellants,

v.

KINGWOOD CROSSROADS, L.P., Appellee.

Kingwood Crossroads, L.P., Cross–Appellant,

v.

Chevron Phillips Chemical Company LP, Exxon Land Development, Inc., and Kingwood Place West Community Association, Inc., Cross–Appellees.

No. 14–08–00329–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 26, 2011.

38

Scott D. Marrs, James R. Young, Jeffrey D. Roberts, Steven J. Watkins, Nancy R. Manderson, Sean P. Milligan, Jeffery T. Nobles, David M. Gunn, Pamela W. Montgomery, David Kriewaldt, Houston, for appellants.

Mark D. Manela, T.H. Waters III, Houston, Douglas W. Alexander, Austin, for appellees.

Panel consists of Chief Justice HEDGES and Justices SEYMORE and SULLIVAN.

## OPINION

CHARLES W. SEYMORE, Justice.

■ This case, consisting of numerous claims and counterclaims, arose out of a failed transaction for the sale of real property. The trial court rendered judgment after a jury verdict. In the original appeal, Chevron Phillips Chemical Company LP ("CP Chem") and Exxon Land Development, Inc. ("ELDI") challenge certain aspects of the judgment in favor of Kingwood CrossRoads, L.P. ("Kingwood CrossRoads"). In the cross-appeal, Kingwood CrossRoads assails some portions of the judgment in favor of CP Chem and ELDI and also names Kingwood Place West Community Association, Inc. ("the Association") as a cross-appellee. We affirm in part, reverse and render in part, and reverse and remand in part.[1]

### I. BACKGROUND

The record from the lengthy trial of this case is quite voluminous. We set forth only the facts pertinent to our disposition, which nonetheless are extensive.

### A. Factual Background

The property at issue is a 69.762–acre tract of land in Kingwood Place West, a commercial subdivision in the master-planned community of Kingwood in Montgomery County, Texas. ELDI was responsible for commercial development of Kingwood beginning in the 1970s.[2] In 1984, ELDI filed in the public records of Montgomery County a document entitled "Revised and Restated Declaration of Covenants, Conditions and Restrictions For Kingwood Place West" ("the DCC & Rs"). This document sets forth many conditions and restrictions applicable to property subject thereto, including rules for maintenance assessments, and requires approval of the Architectural Review Committee ("ARC") for construction plans, sign placement, landscaping, and variances from minimum setbacks for buildings and parking. The Association is responsible for enforcing the DCC & Rs, maintaining common areas, and collecting assessments.

In 1994, ELDI sold the property to a Chevron entity pursuant to a "Purchase and Sale Agreement" ("PSA") which was subsequently amended twice, including, as relevant to the present case, by a "Second Amendment to Purchase and Sale Agreement" ("the 1994 Second Amendment to PSA"). The sale was culminated on June 29, 1994, when ELDI conveyed the property to the Chevron entity via a "Special Warranty Deed" which was subsequently amended in 1995 by an "Amendment to Deed."

In July 2000, CP Chem was formed as a joint venture of Chevron Corporation and Phillips Petroleum, and the property was transferred to CP Chem. After the transfer, CP Chem designated the property as surplus and sought a purchaser. In De-

---

1. This case was transferred to our court from the Beaumont Court of Appeals; therefore, we must decide the case in accordance with its precedent if our decision would be otherwise inconsistent with its precedent. *See* Tex. R.App. P. 41.3.

2. ELDI was previously known as "Friendswood Development Company"—its name at the time of several transactions pertinent to the present case; we will hereafter refer to this entity as "ELDI" for all purposes because the distinction between names is immaterial to our analysis.

cember 2002, Blenheim Corporation, which is owned by Keith Stone, and CP Chem signed a "Commercial Contract—Unimproved Property" ("the contract"), whereby Blenheim Corporation agreed to purchase the property for $3.285 million. Blenheim Corporation has assigned its rights and obligations under the contract to Kingwood CrossRoads, a partnership formed by Stone and others to develop the property.[3]

Pertinent to this suit, two contractual obligations required resolution before closing of the transaction. First, in the contract, CP Chem agreed that, before expiration of the initial feasibility period, it would secure to Kingwood CrossRoads's "reasonable satisfaction" removal of any restrictions precluding use of the property for certain commercial purposes.[4] The Amendment to Deed governing the conveyance from ELDI to Chevron did contain "Use Restrictions," which Kingwood CrossRoads opined could be construed as precluding use of the property for these commercial purposes. Kingwood Cross-Roads requested that CP Chem secure removal of these restrictions because they would thwart Kingwood CrossRoads's development and marketing plans. CP Chem eventually obtained ELDI's execution of a "Second Amendment to Deed," which permitted use of the property for the commercial purposes referenced in the contract. ELDI placed this document in escrow with First American Title Company ("First American"), whom the parties retained to provide title insurance for the transaction.

Second, in the contract, CP Chem also agreed to furnish Kingwood CrossRoads at closing a title insurance policy subject only to "those title exceptions permitted by this contract or as may be approved by [Kingwood CrossRoads] in writing" and standard exceptions in the promulgated form of title policy. The contract further contained provisions for "cure" of title defects, which we will later discuss in more detail. In essence, CP Chem was required to provide Kingwood CrossRoads a commitment for title insurance within thirty days after contract execution. Kingwood CrossRoads could object to defects in title by a certain deadline. CP Chem was allowed, but not obligated, to cure timely objections within a defined "cure period," not to exceed the contract's feasibility period, provided that Kingwood CrossRoads could terminate the contract if CP Chem failed to cure.

In late December 2002, First American issued its first title commitment, which included an exception objectionable to Kingwood CrossRoads. Specifically, the commitment referenced a document executed by ELDI on June 29, 1994 (the day it conveyed the property to CP Chem's predecessor), and filed with the Montgomery County Clerk on July 1, 1994, purporting to annex the property "into the jurisdiction of [the DCC & Rs]," and "subject [the property] to [the DCC & Rs] and the authority of [the Association]" ("the Annexation Document"). Kingwood Cross-Roads considered annexation an impediment to its ability to develop and market the property based on the fact that the property would be subject to the DCC & Rs, including the requirement for ARC approval of construction plans, and annexation would entail payment of assessments.

---

3. In light of the assignment, we will hereafter refer to "Kingwood CrossRoads" as though it was the original party to the contract.

4. The referenced feasibility period was the time during which Kingwood CrossRoads could terminate the contract for any reason and obtain return of its $125,000 earnest money.

Whether the property was validly annexed via filing of this document became the subject of a vigorous dispute. After receiving the commitment, Kingwood CrossRoads's counsel for the real-estate transaction questioned whether the Annexation Document effectively annexed the property because (1) no legal description of the property purportedly being annexed was attached, and (2) the general description of the property purportedly being annexed referenced "Kingwood Place West," but counsel believed the property at issue was located in "Kingwood Place." Counsel confirmed with First American that there was no property-description addendum to the Annexation Document. Counsel also requested any bills for assessments CP Chem had received from the Association. CP Chem replied that the property was not part of the Association and thus CP Chem did not receive bills for, or pay, assessments.

Counsel then lodged a formal objection to the annexation exception with CP Chem and opined the Annexation Document was ineffective. However, counsel doubted his legal opinion would satisfy First American and recommended that CP Chem ask ELDI to execute a "Confirmation of Non–Annexation." CP Chem complied, explaining to ELDI that the property was not properly annexed.

By late February 2003, CP Chem and Kingwood CrossRoads had persuaded First American to revise the title commitment by deleting the annexation exception and any reference to the DCC & Rs. Over the next year and a half, First American periodically renewed this commitment as the transaction proceeded toward the scheduled closing.

Notwithstanding the revised title commitment, Kingwood CrossRoads still wanted ELDI's Confirmation of Non–Annexation because mere existence of the Annexation Document could affect marketability of the property. Throughout 2003 and the first part of 2004, CP Chem and Kingwood CrossRoads negotiated with ELDI, attempting to resolve the issue.

CP Chem engaged outside counsel, who also opined the Annexation Document was ineffective because it lacked a legal property description and was filed with the county clerk several days after ELDI divested itself of the property via the Special Warranty Deed. Counsel also noted the Association had taken no action affecting the property, including assessment of fees, since the original Chevron entity's purchase. CP Chem forwarded its counsel's written opinion to ELDI. An ELDI attorney replied that ELDI and CP Chem's predecessor had agreed to annexation. The attorney was referring to a provision in the 1994 Second Amendment to PSA stating, "[p]rior to Closing the Property shall be annexed into [the Association]" and the fact that the form Annexation Document was an exhibit to this amended PSA. ELDI suggested CP Chem re-record the Annexation Document to prevent any further questions. Due to corporate restructuring, CP Chem was missing the 1994 Second Amendment to PSA. After receiving the document, CP Chem's counsel continued to opine the property was not annexed. ELDI ultimately indicated it was willing to compromise regarding some restrictions but maintained that the property had been validly annexed.

During these efforts, Kingwood Cross-Roads and CP Chem continually communicated with each other. Richard Mawdsley, a CP Chem in-house counsel, was originally responsible for conducting the sale. According to Kingwood CrossRoads, Mawdsley promised that CP Chem would obtain ELDI's Confirmation of Non–Annexation even through litigation if necessary. King-

wood CrossRoads stressed to CP Chem that it had already invested considerable time and money towards acquiring, marketing, and developing the property, resolution of the annexation issue was "critical" to its ability to develop the property, and it understood a "low key" approach was preferable but expected CP Chem to litigate the issue if ultimately necessary, as promised.

According to Kingwood CrossRoads, Mawdsley also promised that CP Chem would execute a "Declaration of Non-annexation" to satisfy future purchasers and title insurers. Kingwood CrossRoads considered a CP Chem declaration, while less conclusive than an ELDI confirmation, more effective than the "technical legal analysis," which the parties and First American had found convincing.

Mawdsley did not correct Kingwood CrossRoads's expectations regarding litigation and the declaration, but he did not affirmatively confirm such promises. In internal CP Chem e-mails, Mawdsley and his superior, Arlen Allison, did opine the attempted annexation was invalid, acknowledged the issue must be resolved because Kingwood CrossRoads was expending money on due diligence efforts, and outlined a plan to obtain ELDI's confirmation, mentioning litigation "as a last resort."

Mawdsley's employment with CP Chem ended in mid–2003. Allison became the primary CP Chem contact for the sale although Kingwood CrossRoads also communicated with other CP Chem employees or officers. Kingwood CrossRoads continued emphasizing the importance of resolving the annexation issue to its ability to develop the property and insisting that it had been repeatedly assured CP Chem would litigate with ELDI, if necessary. CP Chem expressed to Kingwood CrossRoads its continuing interest in resolving

the issue and, at one point, listed litigation as the last of several "options," but emphatically disagreed it was obligated to resolve the issue or had promised to litigate. CP Chem invited Kingwood CrossRoads to forego the purchase before expiration of the feasibility period if it was not satisfied.

In February or March 2004, CP Chem ceased efforts to resolve the annexation issue with ELDI because they were obviously futile. The feasibility period, which had been extended several times, finally ended on June 29, 2004. Although Kingwood CrossRoads was profoundly displeased with CP Chem's refusal to litigate the annexation issue against ELDI, Kingwood CrossRoads decided to proceed with closing because it had already incurred expenses preparing for performance and at least had a commitment for title insurance to protect it against an annexation claim and CP Chem's agreement to sign the Declaration of Non-annexation.

During the next two months, the parties discussed the Declaration of Non-annexation. Kingwood CrossRoads reiterated that Mawdsley had promised CP Chem would sign the declaration. CP Chem replied that it had made no such promise, bore no obligation to sign the declaration or resolve the annexation issue, and hoped Kingwood CrossRoads would close without the declaration. However, CP Chem was willing to sign an affidavit averring it had never paid assessments or received benefits from the Association.

Closing was originally scheduled for August 30, 2004. By letter dated August 23, 2004, CP Chem informed Kingwood CrossRoads that CP Chem could not identify whether certain documents germane to the title issue had been provided to First American and requested a discussion by the end of the next day to confirm disclosure had been made or outline how to

proceed with disclosure. Receiving no response, CP Chem sent a letter to First American on August 25, 2004, which we will later discuss in more detail. CP Chem effectively informed First American that ELDI claimed the property is annexed and subject to the DCC & Rs, ELDI produced the 1994 Second Amendment to PSA supporting its position after First American deleted the annexation exception, and the parties had been unable to resolve the dispute.

Before CP Chem sent this letter to First American, Kingwood CrossRoads had actually attempted to respond to CP Chem's request for a discussion. In its response, Kingwood CrossRoads urged CP Chem to honor its agreements, including the promise to provide a Declaration of Non-annexation. Kingwood CrossRoads also protested CP Chem's intent to provide more information to First American: Kingwood CrossRoads claimed CP Chem was trying to persuade First American to dishonor its title commitment and disclosure to First American regarding ELDI's position on the annexation issue was unnecessary because limitations would bar any attempt by ELDI to enforce the agreement in the 1994 Second Amendment to PSA to effect annexation. However, Kingwood CrossRoads was informed of CP Chem's letter to First American before sending its response to CP Chem.

The closing was postponed until September 15, 2004 in light of CP Chem's letter to First American. Kingwood CrossRoads appeared for the closing, but that day, First American announced it would not issue a title policy without an annexation exception. First American acknowledged validity of the position that the property is not annexed; but based on mere existence of the dispute, it would not risk undertaking the costs of defending title against an annexation claim. In a revised title commitment issued that same day, First American reinserted the annexation exception. Shortly thereafter, Kingwood CrossRoads sued First American in a Harris County court.

During the rest of 2004 and early 2005, Kingwood CrossRoads and CP Chem discussed various resolutions to close the transaction. CP Chem allowed Kingwood CrossRoads to seek insurance from another company but insisted on full disclosure regarding the annexation issue. Although Kingwood CrossRoads maintained that CP Chem was obligated to furnish the insurance, Kingwood CrossRoads sought another insurer because CP Chem refused to do so. However, no company was willing to issue a policy without an annexation exception.

In early January 2005, CP Chem notified Kingwood CrossRoads that it elected to terminate the contract and retain the earnest money because Kingwood CrossRoads had breached but remained willing to complete the sale if closing occurred before March 31, 2005. Additionally, CP Chem obtained ELDI's agreement to extend until March 31, 2005 its Second Amendment to Deed amending the use restrictions, but ELDI tied any further extensions to a satisfactory concession on annexation. On February 24, 2005, CP Chem notified Kingwood CrossRoads that CP Chem's most recent settlement offer had expired without timely acceptance by Kingwood CrossRoads and CP Chem intended to settle the annexation dispute with ELDI to avoid "costly" litigation.

Concerned that ELDI and CP Chem would cloud title by successfully annexing the property, Kingwood CrossRoads amended its suit on March 11, 2005 to add CP Chem, ELDI, and the Association as defendants. On March 16, 2005, ELDI withdrew the Second Amendment to Deed from escrow admittedly to prevent the

transaction from closing without acknowledgement of a valid annexation. Shortly thereafter, Kingwood CrossRoads dismissed the suit and refiled in Montgomery County (the underlying trial court) for venue reasons.

Kingwood CrossRoads eventually settled with the Association and First American for $950,000 total.[5] Kingwood CrossRoads's lengthy live petition contained numerous claims against CP Chem and ELDI, including breach of contract, tortious interference with contract, fraud, and negligent misrepresentation. Kingwood CrossRoads requested damages, equitable relief, including an order for specific performance of the contract, and a declaratory judgment that the property is not annexed.

CP Chem filed a counterclaim for breach of contract, among other actions. ELDI filed a counterclaim requesting a declaratory judgment that the property is annexed or otherwise subject to the DCC & Rs by agreement between ELDI and CP Chem's predecessor or by implication.

## B. Jury Findings

A jury trial was conducted on the remaining claims. The original and an additional jury charge were extensive. Pertinent to this appeal, the jury found as follows:

### Annexation and DCC & Rs Questions

The Annexation Document did not sufficiently describe the property to be annexed.

ELDI and the Association waived, and are estopped from, enforcement of the Annexation Document.

ELDI and CP Chem agreed the property would be subject to the DCC & Rs regardless of whether it was annexed.

The property is subject to the DCC & Rs by implication.

ELDI and the Association neither waived, nor are estopped from, enforcement of the DCC & Rs.

### Contract Questions

CP Chem failed to comply with the contract.

Kingwood CrossRoads sustained $4 million in loss-of-benefit-of-the-bargain damages and $350,000 in out-of-pocket damages as a result of CP Chem's failure to comply.

CP Chem's failure to comply was excused by impracticability.

Kingwood CrossRoads did not fail to comply with the contract and was ready, willing, and able to perform but was prevented from doing so by another.

Kingwood CrossRoads was a third-party beneficiary of the Second Amendment to Deed, but ELDI did not fail to comply with this instrument.

### Fraud Questions

CP Chem committed fraud against Kingwood CrossRoads, causing the following damages: $350,000 in out-of-pocket expenses incurred by Kingwood CrossRoads in preparation for, or performance of, the contract; and $2.5 million in attorneys' fees for litigating the declaratory-judgment action concerning the annexation issue against ELDI.

ELDI did not commit fraud but did conspire with CP Chem to commit fraud (submitted relative to only the $350,000 out-of-pocket damages).

---

5. The Association remains an appellee in Kingwood CrossRoads's cross-appeal apparently because issues involving status of the property affect the Association, but it seeks no appellate relief.

CP Chem and ELDI made negligent misrepresentations, causing $350,000 in out-of-pocket damages.

### Tortious Interference Questions

ELDI intentionally interfered with the contract but possessed a good-faith belief it had a right to do so.

ELDI and CP Chem intentionally interfered with the title commitment but each possessed a good-faith belief it had a right to do so.

## C. The Judgment

The trial court conducted a hearing on various post-trial motions and issues pertaining to rendering judgment. On January 11, 2008, the court signed a final judgment containing many numbered paragraphs, encompassing the following rulings:

### Declaratory Judgments and Equitable Relief

The trial court rendered the following declarations:

The property is not annexed because the Annexation Document contained a legally insufficient property description; or if it is determined on appeal that the property is annexed, ELDI and the Association waived, or are estopped from enforcing, their rights under the Annexation Document. (Paragraph 9)[6]

The property is subject to the DCC & Rs regardless of whether it is annexed; and ELDI and the Association have neither waived, nor are estopped from enforcing, their rights under the DCC & Rs. (Paragraph 10)

The court also ordered CP Chem and Kingwood CrossRoads to specifically perform the contract. (Paragraph 11)

### Monetary Damages and Attorneys' Fees Awarded to Kingwood CrossRoads

The court included several paragraphs addressing the award of monetary damages and attorneys' fees to Kingwood CrossRoads. The court first stated that Kingwood CrossRoads is "entitled" to recover the following:

$2.5 million in fraud damages against CP Chem. (Paragraph 1)

$2,942,335 in attorneys' fees against CP Chem on Kingwood CrossRoads's breach-of-contract action or $2,795,218.25 if it is determined on appeal that these fees should have been segregated. (Paragraph 4)

$1,912,517.75 in attorneys' fees against CP Chem on Kingwood CrossRoads's declaratory-judgment action or $1,816,891.86 if it is determined on appeal that these fees should have been segregated. (Paragraph 5)

$1,029,817.25 in attorneys' fees against ELDI on Kingwood CrossRoads's declaratory-judgment action or $978,326.39 if it is determined on appeal that these fees should have been segregated. (Paragraph 6)[7]

---

**6.** The jury also found that execution of the Special Warranty Deed, the Annexation Document, and the 1994 Second Amendment to PSA was contemporaneous with filing the Special Warranty Deed and the Annexation Document. This question was submitted at ELDI's request in an attempt to prove annexation despite lack of a legal property description in the Annexation Document and ELDI's filing of the document after divesting itself of the property. However, the trial court obviously rejected application of the contemporaneous-filing theory by ruling the property was not annexed.

**7.** During trial, the court remarked it would require Kingwood CrossRoads to segregate attorneys' fees. The parties stipulated they would not segregate when proving fees to the jury but present segregation arguments to the court after trial. Thus, the jury determined total fees incurred by the parties: $3 million by Kingwood CrossRoads (apparently reduced by the court to $2,942,335); and $1.2 million by CP Chem. Then, in the judgment,

The court then included Paragraph 8a which stated,

> Kingwood CrossRoads shall recover: (i) damages from CP Chem for fraud in the amount of $2,500,000.00: and (ii) attorneys' fees from [ELDI] for Kingwood CrossRoads' prosecution of its claim for declaratory judgment in the amount of $1,029,817.25, or $978,326.39 if on appeal it is determined that Kingwood Cross-Roads should have segregated its attorneys' fees. Kingwood CrossRoads' total recovery, not including pre-and post judgment interest, appellate attorneys' fees, or sanctions and appellate attorneys' fees for the sanctions award, shall not exceed $2,942,335.00 or, if on appeal it is determined that Kingwood Cross-Roads should have segregated its attorneys' fees, $2,795,218.25.

The above cited portions of the judgment are not exactly clear: In Paragraphs 1, 4, 5, and 6, the court outlined amounts Kingwood CrossRoads is "entitled" to recover. However, Paragraph 8a stating that Kingwood CrossRoads "shall recover" certain amounts is more of an actual order for recovery; yet it omitted attorneys' fees against CP Chem on Kingwood Cross-Roads's contract action despite the court's determination that Kingwood CrossRoads was "entitled" to recover these fees. It appears from all of these paragraphs and the court's comments at the post-trial hearing that Paragraphs 1, 4, 5, and 6 outlined damages and attorneys' fees Kingwood CrossRoads is authorized to recover, but paragraph 8a limited total recovery to $2,942,335. Regardless, as explained below, we do not uphold recovery of any above-outlined amounts; therefore,

we need not ascertain the specific recovery intended.

### Attorneys' Fees Awarded to CP Chem

The court awarded CP Chem, as a "prevailing party" in Kingwood CrossRoads's contract action and "as a just and equitable award" under the Texas Declaratory Judgment Act, attorneys' fees from Kingwood CrossRoads of $1,200,000 or this amount reduced by 5% if it is determined on appeal that CP Chem should have segregated attorneys' fees. (Paragraph 8b)

### Appellate Attorneys' Fees

The court also awarded both Kingwood CrossRoads and CP Chem attorneys' fees for prevailing in a court of appeals or the Supreme Court of Texas. (Paragraph 12)

### Sanctions Against ELDI

The court had granted Kingwood Cross-Roads's pre-trial motion for sanctions against ELDI based on a discovery dispute. In the judgment, the court assessed $637,612.50 in sanctions and awarded Kingwood CrossRoads additional attorneys' fees if it prevails on an appeal of the sanctions. (Paragraphs 13 and 14)

### Take–Nothing Rulings

The remainder of the judgment contains rulings that the parties take nothing on claims for which jury findings supported no liability or damages assessed by the jury were offset in full by settlement credits, including the following: Kingwood CrossRoads's claims for breach-of-contract damages and tortious interference against CP Chem and ELDI; CP Chem's counterclaims; and Kingwood CrossRoads's $350,000 in out-of-pocket damages for fraud and negligent misrepresentation

---

the court found segregation was not required relative to amounts awarded therein; instead, it ruled that Kingwood CrossRoads was "entitled" to recover its total fees for prosecuting its contract action against CP Chem and for prosecuting its declaratory-judgment action,

albeit the court divided liability for the latter among CP Chem and ELDI. Alternatively, the court decided it attorney-fee awards must be reduced by 5% if an appellate court requires segregation.

against CP Chem and ELDI (offset by settlement credits).

## II. The Issues

CP Chem presents six numbered issues but essentially challenges three aspects of the judgment: (1) the specific-performance order; (2) the award of fraud damages to Kingwood CrossRoads; and (3) the award of attorneys' fees to Kingwood Cross-Roads.

In its two issues, ELDI challenges (1) the award of attorneys' fees to Kingwood CrossRoads, and (2) the sanctions order. Under its first issue, ELDI also contends the trial court erred by declaring the property is not annexed. However, ELDI advances this argument only to attack King-wood CrossRoads's recovery of attorneys' fees for obtaining the declaration; ELDI presents alternative reasons the award is allegedly improper even if the property is not annexed.

In its cross-appeal, Kingwood Cross-Roads presents three issues, challenging (1) the declaration that the property is subject to the DCC & Rs even if not annexed, (2) the jury's impracticability finding, and (3) the award of attorneys' fees to CP Chem.

We will first address the contract issues presented by both Kingwood CrossRoads and CP Chem because our decision on these issues drives the disposition of some other issues. As discussed below, we uphold the jury's finding of impracticability but conclude the trial court erred by ordering specific performance. We then conclude the evidence is legally insufficient to support the fraud finding against

CP Chem. In light of our reversing the specific-performance order, we conclude the trial court erred by declaring the property is not annexed and Kingwood CrossRoads's attack on the declaration regarding the DCC & Rs is rendered moot. Additionally, based on these foregoing conclusions, we hold the trial court erred by awarding attorneys' fees to Kingwood CrossRoads for prosecuting any of its claims but CP Chem and Kingwood CrossRoads are each entitled to recover attorneys' fees for successful defending the other's contract claims. Finally, we uphold the sanctions against ELDI.

## III. Impracticability

The jury found that CP Chem's failure to comply with the contract was excused by impracticability. Kingwood Cross-Roads challenges this finding because it precluded recovery of monetary damages.[8] CP Chem contends it complied with the contract but also urges the impracticality finding should be upheld.

Preliminarily, we must define the action which allegedly constituted a breach of contract. Although, at trial, Kingwood CrossRoads suggested several manners in which CP Chem breached the contract, Kingwood CrossRoads primarily focused on CP Chem's failure to furnish a title policy with no annexation exception. On appeal, Kingwood CrossRoads relies solely on this action when contending CP Chem breached the contract and challenging the impracticability finding.

Kingwood CrossRoads presented evidence that, at expiration of the feasibility period, it intended to close despite ELDI's

---

**8.** At the post-trial hearing, the court commented, "there is no past breach . . . as to any party" and "the jury found [CP Chem] . . . didn't breach." However, the court did not specifically state it was disregarding the jury's failure-to-comply finding. Therefore, we construe the court's refusal to award damages as based on the impracticability finding. Even if the court intended to disregard the failure-to-comply finding, our disposition would be the same because we uphold the impracticability finding.

refusal to confirm non-annexation because (1) it had received an uninterrupted series of title commitments containing no annexation exception, (2) CP Chem had agreed to sign a Declaration of Non-annexation, (3) the Second Amendment to Deed easing use restrictions was in escrow with First American, and (4) Kingwood CrossRoads possessed all funds necessary to close. Kingwood CrossRoads's real-estate counsel testified that First American's last-minute reinsertion of the annexation exception was the only reason the transaction did not close on September 15, 2004 and CP Chem had complied with all contractual obligations except furnishing a title policy with no annexation exception.[9] Thus, Kingwood CrossRoads claimed it was ready, willing, and able to perform but CP Chem's breach prevented the closing because Kingwood CrossRoads's willingness to purchase the property was contingent on obtaining insurance to protect against a future annexation claim. Accordingly, we evaluate the contract issues with respect to this alleged breach.[10]

 Kingwood CrossRoads contends the evidence is legally insufficient to support the jury's finding that CP Chem's

failure to furnish the title policy was excused by impracticability. When examining a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005). We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. The jury is sole judge of the credibility of witnesses and the weight to be given their testimony. *Id.* There is "no evidence" or legally-insufficient evidence when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827.

---

9. CP Chem's later refusal to sign the Declaration of Non-annexation did not form a basis for Kingwood CrossRoads's breach-of-contract action because no such obligation was imposed under the contract. Kingwood CrossRoads did plead that CP Chem breached the contract by failing to deliver the Second Amendment to Deed (which was provided but later retrieved by ELDI). On appeal, Kingwood CrossRoads does not challenge the impracticability finding relative to this alleged breach.

10. CP Chem asserts Kingwood CrossRoads's breach-of-contract claim was based on CP Chem's failure to convey property free of the DCC & Rs and the jury found impracticability because the property was subject to the DCC & Rs even if it was not annexed. However, the basis for the breach-of-contract claim was not CP Chem's failure to deliver property

unencumbered by the DCC & Rs irrespective of the annexation status. On appeal, Kingwood CrossRoads asserts that all parties knew the issue was whether the property was annexed and ELDI claimed it was subject to the DCC & Rs irrespective of the annexation status only when it was unsuccessful at proving annexation. Kingwood CrossRoads does not cite specific instances in the record supporting this assertion. However, the import of the record as a whole shows that, between contract execution and the unconsummated closing, discussions among, and efforts by, at least CP Chem and Kingwood CrossRoads focused on whether the property was annexed as though it was the only manner in which the DCC & Rs were applicable. The evidence reflects that First American's refusal to issue a policy without the annexation exception led to the failed transaction.

The jury was instructed as follows regarding impracticability:

> Failure to comply is justified if [CP Chem's] performance was impracticable. 'Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the nonoccurrence of which was a basic assumption on which the contract was made, its duty to render that performance is discharged.
>
> A party is expected to use reasonable efforts to surmount obstacles to performance, and a performance is impracticable only if it is so despite such efforts.

Kingwood CrossRoads argues the evidence is legally insufficient to support the impracticability finding because (1) as a matter of law, CP Chem assumed the risk that performance might become impracticable, (2) there is no evidence performance became impracticable "without [its] fault," and (3) there is no evidence it used "reasonable efforts" to surmount the obstacle to performance.

## A. Assumption–of–Risk Argument

With respect to both breach and impracticability issues, CP Chem suggests the contract did not impose the "impossible task" of furnishing a title policy with no annexation exception because such action would require the cooperation of a third party (First American) over whom CP Chem had no control. Kingwood Cross-Roads contends the contract indeed imposed such a requirement; therefore, by accepting the contractual obligation of having a third party act, CP Chem assumed the risk First American might not do so and CP Chem's non-compliance may not be excused for impracticability.

■ The definition of "impracticability" submitted to the jury was consistent with the definition set forth in the Restatement of Contracts and recognized under Texas law except the trial court omitted the following emphasized language: "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, its duty to render that performance is discharged, *unless the language or the circumstances indicate the contrary.*" Restatement (Second) of Contracts § 261 (1981) (emphasis added); *see Tractebel Energy Mktg., Inc. v. E.I. du Pont de Nemours & Co.*, 118 S.W.3d 60, 64–65 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (recognizing that section 261 exists in Texas law). This emphasized language encompasses the assumption-of-risk principle relied on by Kingwood CrossRoads. *See Estate of Pingree v. Triple T Foods, Inc.*, 430 F.Supp.2d 1226, 1237 (D.Kan. 2006); Restatement (Second) Of Contracts § 261, cmt. c.

Kingwood CrossRoads cites authority stating that " 'if the contract, properly construed, shows that the promisor assumed the risk of unanticipated events, the occurrence of such events does not excuse performance.' " *Robberson Steel, Inc. v. J.D. Abrams, Inc.*, 582 S.W.2d 558, 561 (Tex. Civ.App.-El Paso 1979, no writ) (quoting *W. Los Angeles Inst. for Cancer Research v. Mayer*, 366 F.2d 220 (9th Cir.1966)); *see* Restatement (Second) of Contracts § 261, cmt. c ("A party may, by appropriate language, agree to perform in spite of impracticability that would otherwise justify his non-performance under the rule stated in this Section. He can then be held liable for damages although he cannot perform. Even absent an express agreement, a court may decide, after considering all the circumstances, that a party impliedly assumed such a greater obligation.").

Kingwood CrossRoads also cites the principle that, "[e]ven if a party contracts to render a performance that depends on some act by a third party, he is not ordinarily discharged because of a failure by that party because this is also a risk that is commonly understood to be on the obligor." Restatement (Second) of Contracts § 261, cmt. e; *see Toyo Cotton Co. v. Cotton Concentration Co.*, 461 S.W.2d 116, 118 (Tex.1970) ("'One who contracts to render a performance or produce a result for which it is necessary to obtain the cooperation of third persons is not excused by the fact that they will not cooperate. This is a risk that is commonly understood to be on the promisor, in the absence of a provision to the contrary ....'") (quoting 6 Arthur L. Corbin, *Corbin on Contracts* § 1340 (1962)).

 Defenses to breach of contract generally entail fact questions unless the facts are uncontested. *See Tractebel Energy Mktg.*, 118 S.W.3d at 65. However, in this case, whether CP Chem assumed the risk of the unanticipated event is a question of law because it involves contract construction. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex.1999) (holding that construction of unambiguous contract is question of law for the court). Kingwood CrossRoads contends the trial court erred by failing to

conclude that CP Chem assumed the risk as a matter of law.[11] In construing a written contract, our primary concern is ascertaining the true intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003). We must examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless. *Id.*

Because we uphold the impracticability finding, we need not decide whether CP Chem failed to comply with the contract when it did not furnish a title policy with no annexation exception. Nevertheless, these issues are somewhat interrelated because understanding the contentions regarding CP Chem's alleged obligation to furnish such a policy is necessary to address whether it was permitted to assert an impracticability defense.

Admittedly, the contract questions in this case are difficult with respect to interpreting the parties' intent as expressed in the contract. Specifically, the contract expressly required CP Chem to furnish a policy subject only to "those title exceptions permitted by this contract or as may be approved by [Kingwood CrossRoads] in writing" and standard exceptions in the promulgated form of the title policy. The

---

11. Kingwood CrossRoads objected on no-evidence grounds to submission of any jury question on impracticability. Alternatively, Kingwood CrossRoads objected to the question submitted because the court omitted language embodying the assumption-of-risk principle, and Kingwood CrossRoads tendered language encompassing this principle. *See Tractebel Energy Mktg.*, 118 S.W.3d at 68 (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex.2003) when recognizing that generally jury question must incorporate elements prescribed by Restatement if it has been adopted under Texas law). In its post-trial motion to disregard, Kingwood CrossRoads argued the evidence is insufficient to support the imprac-

ticability finding under a proper definition. Accordingly, the issue is whether CP Chem assumed the risk as a matter of law whether Kingwood CrossRoads frames its appellate legal-sufficiency challenge as complaining the trial court (1) submitted any impracticability question or (2) refused to disregard the jury's finding because impracticability was conclusively negated under a proper definition. *See id.* at 68–69 (citing *Wolff*, 94 S.W.3d at 530 in recognizing we measure sufficiency of evidence against definition that should have been submitted when party objected to trial court's erroneous omission of part of the definition).

contract contained no provision expressly permitting an exception for annexation, Kingwood CrossRoads did not agree in writing to this exception, and it was not a standard exception in a form title policy.

Additionally, the cure provisions shed light on the extent to which exceptions were permitted by the contract. These provisions outlined decisions on title exceptions to be made by the parties within a certain time period after receiving the title commitment. If Kingwood CrossRoads did not timely object, it accepted the exception in the policy ultimately furnished. Alternatively, Kingwood CrossRoads could timely object, in which case CP Chem could decide whether to cure. If it declined to cure or was unsuccessful in an attempt to cure, Kingwood CrossRoads could terminate the contract and obtain a refund of its earnest money or proceed with the contract, thereby accepting the exception.

In the present case, Kingwood CrossRoads timely objected, and CP Chem did successfully effectuate a cure—at least during the cure period; i.e., First American deleted the annexation exception from the initial title commitment. However, this case seems to present an unusual situation because the exception later became essentially "uncured" when First American reinserted it in the commitment before the transaction could close.[12]

CP Chem suggests it could not have committed any breach by failing to furnish a policy without the exception at closing because it was never obligated to do so in the first place. CP Chem relies on the language in the cure provisions stating that it "may, *but is not obligated to,* cure [Kingwood CrossRoads's] timely objections within 20 days after Seller receives the objections ...." (emphasis added). However, such a construction renders meaningless the provision in the contract obligating CP Chem to furnish a policy with no exceptions other than those permitted by the contract. Reconciling these provisions, the language stating that CP Chem "is not obligated" to cure timely objections seemingly applied to CP Chem's rights when the commitment was originally issued; CP Chem could elect not to cure, or attempt to cure albeit unsuccessfully, during the cure period. Consequently, exceptions permitted by the contract apparently included those to which Kingwood CrossRoads did not timely object, or those to which it timely objected but later accepted despite CP Chem's election not to cure or inability to cure. Therefore, it appears that, once an exception was cured, it was no longer permitted by the contract, and CP Chem was obligated to furnish a title policy without the exception.

Apparently, Kingwood CrossRoads contends that, once an exception was cured,

---

**12.** CP Chem argues the exception was never cured because of ELDI's refusal to confirm non-annexation and Kingwood CrossRoads knew before expiration of the feasibility period that CP Chem would not cure but elected to proceed with closing. We disagree. Kingwood CrossRoads indeed wanted the annexation dispute resolved with ELDI because it affected marketability of the property. However, the cure effected using the procedures set forth under the contract was removal of the annexation exception from the title commitment irrespective of whether ELDI would

confirm non-annexation. Kingwood CrossRoads was willing to close absent such confirmation because it had the title commitment. In fact, CP Chem obtained summary judgment on any breach-of-contract claims by Kingwood CrossRoads that were based on CP Chem's failure to resolve the annexation issue with ELDI because this extra-contractual promise did not satisfy the statute of frauds. By the same token, CP Chem cannot argue the title exception was never cured because this extra-contractual matter was unresolved.

CP Chem could never claim impracticability if the title company later reinserted the exception because it assumed the risk of such an event. We disagree. On one hand, the contract contained no provision specifically relieving CP Chem of any obligation to furnish a title policy without a cured exception even if it was later reinserted by the title company; the contract does not directly address such a situation. At trial, a CP Chem attorney testified the cure period began anew once First American reinserted the exception, thereby suggesting CP Chem could decide at that time whether to cure. However, we find no such provision in the contract. Moreover, this position seems contrary to the contract provision expressing that the cure period cannot extend beyond the feasibility period, which had already expired when the exception was reinserted; i.e., it was too late for Kingwood CrossRoads to terminate if CP Chem could not effect a cure.

On the other hand, there was no provision under which CP Chem specifically assumed the risk a title company would reinsert an exception that previously had been cured. To the contrary, the cure provisions seemed to ensure that CP Chem would know what exceptions the title company intended to include during a time when CP Chem still had an opportunity to cure, and the only result of its failure to do so was the risk that Kingwood CrossRoads would exercise its right to terminate. Consequently, we cannot agree the parties contemplated that CP Chem would potentially be liable in breach of contract for failing to furnish a policy without an exception because the title company reinserted a cured exception when it was too late for CP Chem to further attempt a cure and for Kingwood CrossRoads to terminate.

Moreover, when First American reinserted the annexation exception, it did not necessarily agree the property was annexed but refused to insure title absent the exception based on mere existence of the dispute. However, this possibility seemed to exist long before First American reinserted the exception because ELDI has consistently maintained the property was annexed and the document in which ELDI and CP Chem purportedly agreed to effect annexation has existed since 1994. We recognize that Kingwood CrossRoads settled with First American before trial; thus, we need not evaluate its liability, including whether it was entitled to reinsert an exception upon receiving further information. However, a paragraph of Kingwood CrossRoads's petition from its original suit against only First American was admitted into evidence. This paragraph at least indicates that, at one point, Kingwood CrossRoads held the same view: CP Chem was not responsible for First American's last-minute reinsertion of the exception based on information that existed when it was originally cured:

> The closing of the purchase and sale transaction contemplated by the [contract] was not consummated on September 15, however, *due solely to the actions or inactions of First American.* Despite its obligations under the [commitment], First American refused to issue the owner's policy of title insurance in accordance with the [commitment].... First American attempted to add additional exclusions/exceptions to the proposed title insurance policy, which were not previously disclosed by First American to Kingwood Cross-Roads despite the fact that the documents evidencing such purported exclusions/exceptions existed long before the [commitment] was issued.... *Additionally, because First American waited to the last possible moment to attempt to unilaterally modify First American's obligations, it deprived CPChem of the*

*ability to cure its noncompliance with its specific obligation under the Sales Contract to deliver a title insurance policy."*

(emphasis added).

In sum, CP Chem may have assumed an obligation that required action by a third party, but subject to the scheme outlined in the cure provisions. *See Toyo Cotton Co.*, 461 S.W.2d at 118 (reciting principle that one who contracts to render performance requiring act of third party assumes risk they will not cooperate *"in the absence of a provision to the contrary "*) (emphasis added). Therefore, this situation was appropriately addressed via the impracticability defense rather than a conclusion that CP Chem did not fail to comply with the contract; i.e., a situation arose (reinsertion of a cured title exception) that prevented CP Chem's compliance and was not directly excused in the contract but was contrary to the scheme set forth therein for resolving title exceptions. *See Tractebel Energy Mktg.*, 118 S.W.3d at 66 (stating that impracticability excuses a party's breach when contract itself does not provide "escape clause" and doctrine's other requirements are satisfied). Accordingly, we reject Kingwood CrossRoads's contention that CP Chem assumed the risk of impracticability as a matter of law.

### B. "Without ... Fault" Element

Kingwood CrossRoads also contends CP Chem did not prove that performance became impracticable without its fault because it actually created the obstacle. Kingwood CrossRoads relies on the letter CP Chem wrote to First American on August 25, 2004 (several days before the originally-scheduled closing), stating in pertinent part,

In preparing for closing we have been unable to determine if certain documentation has been forwarded to [First American] regarding [CP Chem's] acquisition of the subject tract and the purported contemporaneous annexation of the subject tract and imposition of certain architectural review committee approval rights.

Prior to First American initially identifying certain documents purporting to annex the subject tract and to impose architectural review committee approval rights, [CP Chem] was unaware of their existence. In subsequent communications, [Kingwood CrossRoads], who is purchasing the subject tract from [CP Chem], requested that First American omit any title exception with respect to either the annexation or the architectural review committee approval rights. At the time, [CP Chem] personnel were unaware of any potentially relevant agreement and had no record of dues, invoices or other matters relating to the purported annexation of the subject tract.

Although First American omitted such title exceptions from the current commitment, the parties have been unable to reach agreement with representatives of the ... original grantor, [ELDI], to file documents excluding the subject tract from annexation or architectural review committee rights. ELDI produced documents, including a signed Second Amendment to the Purchase and Sale Agreement between [CP Chem] and [ELDI]. The Second Amendment contains provisions relating to both annexation and architectural review committee rights. CPChem thereafter obtained a file containing the Second Amendment and various other documents.

Based on our discussions with ELDI, it is our understanding that ELDI is claiming that: (i) the annexation is effective against the subject tract; (ii) the

1995 Amendment to Deed evidences that the property was intended to be subject to "Declaration of Covenants, Conditions and Restrictions"; and (iii) the 1991 Purchase and Sale Agreement and its 1994 Second Amendment obligate the owner of the subject tract to submit plans for architectural review committee approval. Neither [CP Chem] (nor [Kingwood CrossRoads] to our knowledge) concede that the annexation or architectural review committee rights are effective against the subject tract. Still, despite discussions with ELDI we have not been able to reach a resolution of this dispute that is acceptable to [Kingwood CrossRoads].

. . .

We feel it is appropriate to disclose to you the foregoing information and are happy to discuss with you this matter and related documents if you wish to do so.

Although CP Chem did not exactly "create" the obstacle because ELDI was the party insisting the property was annexed, CP Chem's letter certainly informed First American of the pending dispute. Both the senior underwriting counsel and a vice-president of First American testified the letter caused reinsertion of the exception. Kingwood CrossRoads posits CP Chem cannot prove performance of the contract became impracticable without its fault when it took the action that derailed the transaction. *See, e.g., Nat'l Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 333 (5th Cir.1987) (recognizing party may not rely on impracticability doctrine if it affirmatively caused unanticipated event preventing performance); *Farmers' Elec. Coop., Inc. v. Missouri Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo.1998) (stating with respect to "impossibility" defense, "A party cannot by its own act place itself in a position to be unable to perform a con-

tract, then plead that inability to perform as an excuse for nonperformance"); Restatement (Second) of Contracts § 261, cmt. d (stating impracticability defense does not apply if event is obligor's fault).

At trial and on appeal, the parties have painted contrasting pictures regarding CP Chem's reasons for sending the letter. CP Chem claimed that it attempted to accommodate Kingwood CrossRoads and persuade ELDI to agree the property was not annexed. However, when such efforts proved unsuccessful, CP Chem became concerned that (1) Kingwood CrossRoads had never provided First American with the 1994 Second Amendment to PSA or informed First American of the escalating dispute with ELDI, and (2) CP Chem had previously represented to First American that CP Chem's predecessor had not consented to the annexation whereas CP Chem now possessed the 1994 Second Amendment to PSA indicating the contrary. In essence, CP Chem blamed Kingwood CrossRoads for withholding information from First American because the title commitment required Kingwood CrossRoads to notify First American of any matter that "may" affect title and even First American's underwriting counsel expressed surprise Kingwood CrossRoads had not provided the information contained in the letter. CP Chem contended Kingwood CrossRoads's goal was to obtain insurance with no annexation exception so that it could simply rely on First American to bear the expense of defending title if an annexation claim later arose. In sum, CP Chem claimed the letter was intended solely to provide full disclosure and prevent a later accusation that it committed fraud on an insurance company, rather than to derail the transaction; thus, its sending the letter did not negate availability of the impracticability defense.

Kingwood CrossRoads claims that CP Chem's explanation was "transparently pretextual" and the following actually characterizes what occurred from CP Chem's perspective. Because CP Chem was anxious to consummate the sale, it concurred from the outset that the purported annexation was invalid and promised to resolve the issue. However, ELDI eventually insisted that CP Chem honor its predecessor's 1994 commitment to effect annexation, and ELDI was determined to prevent the sale without an acknowledgement of annexation. As closing approached, CP Chem was forced to choose between two options: selling property that was not annexed to Kingwood CrossRoads resulting in certain and costly litigation with an Exxon entity; or breach the contract thereby risking litigation with a less powerful company. Because CP Chem chose the latter option, it artfully crafted the letter to ensure its motives seemed pure, when its true purpose was soliciting First American to reinsert the annexation exception.

Kingwood CrossRoads relies on several factors to support this position. First, it contends the letter was misleading because CP Chem falsely implied the property was annexed and it had become aware of invoices for assessments. However, CP Chem made clear in the letter it did not necessarily agree the property was annexed. Further, CP Chem's statement that it previously had no record of invoices for assessments could not necessarily be construed as an implication it was subsequently invoiced for such assessments. In fact, the jury heard that Kingwood Cross-Roads's real-estate counsel admitted in his deposition that no part of the letter was untruthful. Accordingly, the jury could have reasonably determined the letter was not misleading.

Next, Kingwood CrossRoads argues that CP Chem lacked any duty to disclose information to First American. However, an outside counsel for CP Chem, who was involved in preparing the letter, opined that disclosure regarding the purported annexation was "proper" and "imperative" so that "the title company could make its own underwriting decision and not subsequently have any claims or recourse against CPChem for not having disclosed it or having concealed it." Kingwood CrossRoads contends this counsel's explanation is belied by the opinion of another expert that the buyer, as proposed insured, rather than the seller, bears the duty to disclose. However, considering the expert's testimony in context, he also opined,

it is not incorrect for another party in the same transaction to disclose material facts about the risks on the title insurance policy to the title insurer; and it is my experience that a party such as a seller has an interest in making sure that adequate or full disclosure has been made because, for example, a seller may have a concurrent liability on warranties of title that it gives and it wants to make sure that the title insurance policy is in full force and effect as to a certain risk. And so the seller will want to make sure that the policy is not voided by concealment and that the insurer has made an intelligent decision in accepting the risk as to which the seller may have the concurrent liability as to warranties of title.

Even First American's underwriting counsel construed the letter as "nothing more than an attempt at full disclosure." Accordingly, the jury could have rationally concluded that, even absent a legal duty to disclose, CP Chem was reasonable to possess concern First American might seek recourse against CP Chem for failure to

disclose and to ensure the policy was not later voided.

Additionally, Kingwood CrossRoads maintains that CP Chem's professed need to correct misleading information was a subterfuge. Kingwood CrossRoads acknowledges another expert opined that generally a seller bears a duty to correct untrue or misleading statements which were relied on by another party to a transaction. Kingwood CrossRoads asserts that CP Chem however gave First American truthful information when originally persuading it to delete the annexation exception: the Annexation Document lacked an adequate property description; and CP Chem had not been billed for, or paid, assessments. According to Kingwood CrossRoads, the only purportedly misleading information CP Chem had provided to First American was a representation that its predecessor had not consented to annexation, but First American could not have relied on this representation because it was made *after* First American deleted the annexation exception. Again, we conclude the jury could have rationally decided it was reasonable for CP Chem to provide complete information throughout the transaction even if First American had not directly relied on any previous misleading information.

Kingwood CrossRoads lastly contends that CP Chem's timing negated its protestation of pure intentions because it was unable to explain why it failed to send the letter until the eve of the closing if it thought disclosure was so important. CP Chem claimed it delayed in providing the information to First American because it thought the annexation issue would be resolved. However, CP Chem realized in May or June of 2004 that efforts to resolve the annexation issue were futile, yet waited several months to send the letter. Nevertheless, the jury was allowed to de-

cide the weight to assign this delay when deciding whether to believe CP Chem regarding its professed reason for sending the letter.

Finally, the jury could have also considered CP Chem's following actions after postponement of the originally-scheduled closing as evidence it did not intend to derail the transaction by sending the letter: it obtained ELDI's extension on the Second Amendment to Deed, which was prerequisite to ultimately closing the transaction; and CP Chem indicated to ELDI that they could not settle the annexation issue while closing the sale to Kingwood CrossRoads remained a possibility.

Our inquiry does not end here because Kingwood CrossRoads suggests that, regardless of CP Chem's motives, there is no "good faith" exception to the rule that a party cannot have created the obstacle on which it bases an impracticability defense. Accordingly, the inquiry is whether, as a matter of law, the obstacle can be construed as arising "without [CP Chem's] fault" when it provided information that contributed to derailment of the transaction yet merely told the truth in order to provide full disclosure. Kingwood CrossRoads suggests that CP Chem's professed motives are immaterial because a party relying on the "impossibility" doctrine must demonstrate it took virtually every action within its powers to perform its contractual duties. *See Farmers' Elec. Coop.*, 977 S.W.2d at 271; *see also Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2nd Cir.1975).

However, an impracticability, not impossibility, defense was submitted to the jury. As recognized under section 261,

Although the rule stated in this Section is sometimes phrased in terms of "impossibility," it has long been recognized that it may operate to discharge a party's duty even though the event has

not made performance absolutely impossible. This Section, therefore, uses "impracticable["] ... to describe the required extent of the impediment to performance. *Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved.... Performance may also be impracticable because it will involve a risk of injury to person or to property, of one of the parties or of others, that is disproportionate to the ends to be attained by performance.*

Restatement (Second) of Contracts § 261, cmt. d (emphasis added).

▆ Based on the testimony presented by CP Chem, the jury could have reasonably concluded that the risk of consequences if CP Chem did not provide full disclosure to First American constituted such an "unreasonable loss or difficulty" or "risk of injury." Therefore, CP Chem's sending the letter did not as a matter of law negate the "without ... fault" element in the following sense: the exception was cured, albeit based on incomplete information unknown to CP Chem at the time; further information affecting the exception was subsequently discovered; and CP Chem believed it was necessary to provide disclosure to First American to prevent unreasonable ramifications.

## C. "Reasonable Efforts" Requirement

▆ Kingwood CrossRoads also contends there is no evidence CP Chem made "reasonable efforts" to overcome the obstacle to performance once First American reinserted the exception. Kingwood CrossRoads suggests CP Chem could have (1) litigated the issue with ELDI, (2) agreed to indemnify First American for the costs of defending title against a later annexation claim, or (3) attempted to settle the annexation issue by offering payment or indemnity to ELDI or the Association.

The jury could have rationally concluded that the first two suggestions were not "reasonable" because both would effectively involve costly and uncertain litigation against ELDI/the Association and the indemnification option was not necessarily viable because it would have required First American's agreement. Relative to the third suggestion, some evidence negated that a monetary settlement would have appeased ELDI because it insisted the property was annexed not only to collect assessments but also to fulfill a duty to all property owners of ensuring uniform application of the DCC & Rs.

In addition, Kingwood CrossRoads cites undisputed testimony that CP Chem made no efforts to obtain insurance from another title company once First American reinserted the exception. However, considering that Kingwood CrossRoads was unsuccessful in obtaining insurance from another company, the jury could have concluded that CP Chem's inaction was immaterial to the impracticability question because it would have been equally unsuccessful.

Finally, the jury could have determined that CP Chem made "reasonable efforts" to overcome the obstacle to performance when it took the following actions: hired outside counsel to analyze the issue; negotiated with ELDI for months; extended the feasibility period and the closing date many times while attempting a resolution; and obtained ELDI's extension of the Second Amendment to Deed while the parties attempted to consummate the transaction. Although these actions, except extension of the Second Amendment to Deed, occurred *before* First American reinserted the annexation exception, they were nonetheless relevant to the reasonable-efforts inquiry because resolution of the annexation dis-

pute would have obviated First American's reinsertion of the exception.[13]

Accordingly, the evidence is legally sufficient to support the jury's implicit finding that, despite sending the letter, CP Chem was "without ... fault" relative to First American's refusal to issue a policy with no annexation exception and used "reasonable efforts" to overcome the obstacle. We overrule Kingwood CrossRoads's second issue.

## IV. Specific Performance

 Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract. *Blue Moon Venture, L.L.C. v. Horvitz,* ——— S.W.3d ———, ———, 2010 WL 4013533, (Tex. App.-Houston [14th Dist.] 2010, no pet.) (mem. op.) (citing *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.-Dallas 2007, pet. denied)). A party seeking specific performance must plead and prove (1) compliance with the contract including tender of performance unless excused by the defendant's breach or repudiation and (2) it was ready, willing, and able to perform at relevant times. *Id.* (citing *DiGiuseppe v. Lawler,* 269 S.W.3d 588, 593–94, 601 (Tex.2008)).

 Whether to award specific performance is a matter committed to the trial court's discretion. *Chapman v. Olbrich,* 217 S.W.3d 482, 491 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (citing *Bell v. Rudd,* 144 Tex. 491, 191 S.W.2d 841, 843 (1946); *Roundville Partners, L.L.C. v. Jones,* 118 S.W.3d 73, 79 (Tex. App.-Austin 2003, pet. denied)). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or,

stated differently, without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). Further, a clear failure by the trial court to ·analyze or apply the law correctly constitutes an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding).

 CP Chem attacks the specific-performance order on several grounds: (1) it prevailed on the impracticability defense, thereby excusing its performance; (2) it did not breach the contract; (3) Kingwood CrossRoads's pleadings do not support the relief; and (4) Kingwood CrossRoads did not prove it was ready, willing, and able to perform. We agree the trial court abused its discretion by ordering specific performance because CP Chem prevailed on its impracticability defense and Kingwood CrossRoads's pleadings did not support specific performance, although our analysis of these grounds is somewhat interrelated.

CP Chem argues that the above-cited rule allowing specific performance upon proof of breach of contract necessarily entails the plaintiff have prevailed on the claim which includes defeating all affirmative defenses. Kingwood CrossRoads contends it defeated CP Chem's impracticability defense for purposes of obtaining specific performance through a temporary-impracticability theory:

> Impracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform while the impracticability or frustration exists but does not discharge his duty or prevent it from aris-

---

13. As we have noted, the trial court ruled that, pursuant to the statute of frauds, CP Chem's alleged unfulfilled promises to resolve the annexation dispute with ELDI could not form the basis for a breach-of-contract action

because the promises were not contained in the contract. Nonetheless, as demonstrated above, CP Chem's efforts to resolve the annexation dispute remained relevant to the impracticability defense.

ing unless his performance after the cessation of the impracticability · or frustration would be materially more burdensome than had there been no impracticability or frustration.

Restatement (Second) of Contracts § 269.

Kingwood CrossRoads argues the temporary obstacle will be removed once this appeal is resolved because it expects we will uphold the declaration that the property is not annexed but reverse the declaration that the property is subject to the DCC & Rs; thus, it can obtain a title policy reflecting the property in an unrestricted state. Alternatively, Kingwood CrossRoads contends that, even if we uphold the declaration regarding the DCC & Rs, it may waive its right to a title policy with no exception for the DCC & Rs and choose to purchase the property in a restricted state. When specific performance was addressed at the post-trial hearing, Kingwood CrossRoads represented that it preferred to recover damages but alternatively purchasing restricted property was preferable to obtaining no property. Kingwood CrossRoads now suggests the declaration that the property is not annexed at least relieves it of paying assessments—a primary reason it insisted the property was unannexed.

Assuming without deciding that the temporary-impracticability theory is recognized under Texas law, the record and jury findings do not support its application in the present case. Specifically, CP Chem prevailed entirely on Kingwood Cross-Roads's breach-of-contract action by obtaining a favorable jury finding on impracticability. *Cf. Stafford*, 231 S.W.3d at 536–37 (granting specific performance in light of finding that defendant breached contract where defendant's performance was not excused by any affirmative defense, including impossibility). Based on the submitted definition of impracticability, the jury found that CP Chem's "duty to render ... performance is discharged." Kingwood CrossRoads does not cite any portion of the record where it requested submission of a jury question on temporary impracticability to rebut this finding or in lieu of the impracticability question as submitted.

When contested fact issues must be resolved before a court can determine the expediency, necessity, or propriety of equitable relief, a party is entitled to have a jury resolve the disputed fact issues. *Di-Giuseppe*, 269 S.W.3d at 596; *Stafford*, 231 S.W.3d at 536–37. Further, because defenses to breach of contract are generally considered jury questions unless the facts are uncontested, *Tractebel Energy Marketing*, 118 S.W.3d at 65, it follows that a plaintiff's theory to rebut such an affirmative defense is also a jury question unless the facts are uncontested.

Kingwood CrossRoads does not cite evidence conclusively demonstrating the impracticability regarding obtaining title insurance was only temporary. For instance, regardless of the status of the property relative to annexation and the DCC & Rs, performance would nonetheless require a title company willing to issue a policy acceptable to Kingwood CrossRoads. However, Kingwood Cross-Roads cites no evidence reflecting the status of obtaining title insurance if the parties were to perform the contract in the future. In fact, the specific-performance issue begs a question regarding the stage at which performance would be resumed: at the point when the contract was previously terminated with First American issuing the policy containing only exceptions conforming to the declarations obtained in this case?; or would the notice and cure procedures outlined in the contract begin anew with a commitment from a different company?

With respect to the first scenario, Kingwood CrossRoads cites no evidence First American remains willing to issue a policy regardless of the status of the property. The trial court also could not foreclose the possibility that a different company might issue a commitment with additional exceptions unsatisfactory to Kingwood CrossRoads which CP Chem is unable to cure.

Furthermore, Kingwood CrossRoads does not cite evidence conclusively establishing that at least one other impracticability to performance was only temporary. Specifically, if we upheld the specific-performance order, it would be necessary to determine the status of the property relative to annexation and the DCC & Rs because the status would be material to Kingwood CrossRoads, as purchaser. However, resolution of those issues is not necessary to disposition of the specific-performance dispute. Notably, regardless of the status relative to annexation and the DCC & Rs, the property undisputedly remains subject to the "Use Restrictions" provision set forth in the Amendment to Deed governing the sale from ELDI to CP Chem's predecessor.[14]

Section 11(3) of the contract required CP Chem to secure removal of these use restrictions to Kingwood CrossRoads's "reasonable satisfaction." The Second Amendment to Deed was the document CP Chem originally obtained from ELDI to comply with Section 11(3). However, after CP Chem terminated the contract, ELDI retrieved the Second Amendment to Deed from escrow. One of Kingwood Cross-

Roads's breach-of-contract claims against CP Chem was based on its failure to deliver the Second Amendment to Deed. On appeal, Kingwood CrossRoads does not challenge the impracticability finding relative to this alleged breach. Moreover, Kingwood CrossRoads did not prevail on any claim against ELDI that could arguably result in equitable relief requiring delivery of the document. Specifically, the jury found that (1) Kingwood CrossRoads was a third-party beneficiary of the Second Amendment to Deed, but ELDI did not fail to comply with this document, and (2) ELDI intentionally interfered with the contract, which claim was based in part on its retrieving the Second Amendment to Deed, but ELDI possessed "a good-faith belief that it had a right to" interfere. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 691 (Tex.1989) (explaining legal-justification or excuse defense to tortious-interference claim). On appeal, Kingwood CrossRoads does not challenge any of these findings or cite evidence that ELDI is willing in the future to deliver such a document, even after a final determination regarding status of the property.

The evidence reflects Kingwood Cross-Roads was so concerned about use restrictions that it would not purchase the property unless CP Chem contractually agreed to secure their removal. Additionally, the import of Kingwood Cross-Roads's numerous communications with CP Chem after contract execution belies Kingwood CrossRoads's present claim that it opposed annexation primarily due to associated assessments. Instead, King-

14. ELDI argues that another portion of this provision which lifted the use restrictions after twenty years from execution of the instrument "but only so long as all buildings or structures erected or maintained thereon are as provided for and in accordance with [the DCC & Rs] applicable to the Property" rendered the property subject to the DCC & Rs;

whereas Kingwood CrossRoads posits this provision was applicable only if the property had otherwise been made subject to the DCC & Rs; i.e., via annexation. Regardless of this dispute, the first portion of the provision undisputedly set forth "Use Restrictions" on the property for the first twenty years.

wood CrossRoads stressed a greater concern that any restrictions, including use restrictions, would hinder its ability to develop or market the property.

We acknowledge that this issue presents a somewhat cyclical fact pattern: ELDI retrieved the Second Amendment to Deed after the transaction failed; CP Chem's alleged breach relative to furnishing the title policy, which caused the transaction to fail, was excused based on impracticability; the impracticability may have been rendered only temporary except that the potential inability to deliver the Second Amendment to Deed created another obstacle to performance. Nevertheless, this fact pattern shows that, although Kingwood CrossRoads needed to defeat only the impracticability finding regarding the title policy to recover breach-of-contract damages, it needed to also defeat the impracticability finding relative to CP Chem's failure to deliver the Second Amendment to Deed to pave the way for specific performance.

Kingwood CrossRoads also asserts that CP Chem did not claim specific performance would be "materially more burdensome," as necessary to preclude specific performance once an impracticability has been removed. *See* Restatement (Second) of Contracts § 269. However, because no jury question on temporary impracticability was submitted and the theory was not conclusively established, CP Chem lacked an opportunity to rebut its application by proving specific performance would be materially more burdensome.

Consequently, there remain two known contingencies to performance of the contract—whether CP Chem can furnish a title policy and existence of use restrictions—and possibly other unknown contingencies which may render performance materially more burdensome. Accordingly, Kingwood CrossRoads failed to conclu-

sively establish, or obtain the necessary jury findings demonstrating, all impracticabilities to performance were only temporary and that CP Chem can presently perform the contract as contemplated by the parties.

Finally, we disagree that Kingwood CrossRoads may simply waive lack of the Second Amendment to Deed and purchase the property in a restricted state because its pleadings do not support such relief. Although Kingwood CrossRoads pleaded for specific performance, it clearly recited removal of all restrictions, including use restrictions, as a contingency to its purchasing the property:

> Kingwood CrossRoads has, on several occasions, both in writing and verbally, re-affirmed to [CP Chem] that Kingwood CrossRoads is and remains ready, willing and able to perform its obligations under the [contract] and close the purchase of the Property *upon [CP Chem's] curing its breach of Section 11(3) of the [contract] by filing the fully executed Second Amendment to Deed against the Property,* and upon the delivery by [CP Chem] to Kingwood CrossRoads of a title policy in conformity with the requirements of the [contract], i.e., without any exception for the ineffective Annexation Document, the [DCC & Rs], or [the Association].

(emphasis added).

 The purpose of pleadings is to give an adversary notice of claims, defenses, and the relief sought. *Herrington v. Sandcastle Condo. Ass'n,* 222 S.W.3d 99, 102 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (citing *Perez v. Briercroft Serv. Corp.,* 809 S.W.2d 216, 218 (Tex.1991)). A trial court cannot enter judgment on a theory of recovery not sufficiently set forth in the pleadings or otherwise tried by consent. *Id.* (citing *Miller v. Towne Servs., Inc.,* 665 S.W.2d 143, 147 (Tex.App.-Hous-

ton [1st Dist.] 1983, no writ)); *see* Tex.R. Civ. P. 301 (providing that "judgment of the court shall conform to the pleadings ..."). Whether Kingwood CrossRoads was willing to purchase the property absent delivery of the Second Amendment to Deed was not an issue tried by consent considering that it claimed CP Chem breached the contract by failing to deliver this instrument.

Accordingly, we conclude the trial court acted beyond its discretion by ordering specific performance. We sustain CP Chem's first issue.

## V. Fraud Damages

After finding that CP Chem committed fraud, the jury found that Kingwood CrossRoads sustained damages in two categories: (1) $350,000 in out-of-pocket damages, such as expenses incurred preparing to perform the contract; and (2) $2.5 million in attorneys' fees to litigate the declaratory-judgment action concerning annexation against ELDI. The judgment included no award for out-of-pocket damages because they were offset by settlement credits. CP Chem challenges the remaining $2.5 million for several reasons: (1) Kingwood CrossRoads's attorneys' fees are not recoverable tort damages; (2) the fraud damages are barred by the statute of frauds; (3) there was no evidence of several elements of fraud, including a misrepresentation, reasonable reliance, or causation; and (4) the trial court erred by crediting the $950,000 settlement against only the $350,000 in out-of-pocket damages instead of all fraud damages. Because we agree there is no evidence of a misrepresentation, we need not address CP Chem's other contentions.

The jury was instructed that the following are the elements of fraud: (1) a material misrepresentation; (2) made with knowledge of its falsity or recklessly without any knowledge of the truth and as a positive assertion; (3) made with the intention that it should be acted on by the other party; and (4) the other party acts in reliance on the misrepresentation and thereby suffers injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47–48 (Tex.1998). The jury was also instructed that a party makes a misrepresentation by, among other methods, "[a] promise of future performance made with an intent, at the time the promise was made, not to perform as promised." *See id.* at 48.

Kingwood CrossRoads's fraud claim relative to the damages challenged on appeal was based on Mawdsley's alleged promise to litigate the annexation issue against ELDI. Kingwood CrossRoads contends Mawdsley made the promise with no intent to perform; thus, Kingwood CrossRoads was forced to pursue the litigation. As emphasized by CP Chem when challenging the reliance element of fraud, Mawdsley's successors at CP Chem emphatically informed Kingwood CrossRoads before expiration of the feasibility period, and long before Kingwood CrossRoads sued ELDI, that CP Chem declined to do so. Nonetheless, according to Kingwood CrossRoads, in reliance on Mawdsley's initial promise to resolve the annexation issue, it expended funds preparing to perform the contract (the $350,000 out-of-pocket damages); therefore, despite learning before expiration of the feasibility period that CP Chem declined to sue ELDI, Kingwood CrossRoads was entitled to remain in the contract and later sue ELDI to protect the investment it already made by ensuring the transaction closed. Consequently, Kingwood CrossRoads seems to acknowledge that the $2.5 million attorneys' fees were not directly incurred in reliance on Mawdsley's promise but maintains they

were damages attributable to the unfulfilled promise.

 Stone testified that Mawdsley indeed made an oral promise to litigate the annexation issue, whereas Mawdsley testified he made no such promise and litigation was presented as merely an option. Although the jury was free to believe Stone's testimony, the evidence is legally insufficient to support a finding that Mawdsley made such promise with intent not to perform. The only evidence Kingwood CrossRoads cites to prove lack of intent to perform is the fact that CP Chem indeed failed to perform and Mawdsley and his successors denied making the promise. However, mere failure to subsequently perform a promise, standing alone, is not evidence of fraud. *Formosa Plastics*, 960 S.W.2d at 48; *see Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex.2006). Similarly, denying that an alleged promise was ever made does not constitute legally sufficient evidence of intent not to perform although denial may be a factor in determining intent. *See Chapa*, 212 S.W.3d at 305; *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex.1992).

Proving a party lacked intent to perform at the time a promise was made is "not easy" because intent to defraud is usually unsusceptible to direct proof. *Chapa*, 212 S.W.3d at 305 (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)). Usually, successful claims have involved confessions by the defendant or its agents of the requisite intent, but " 'slight circumstantial evidence' " of fraud, when considered with a breach of the promise to perform, is sufficient to support a finding of fraudulent intent. *Id.* (citing *Formosa Plastics Corp.*, 960 S.W.2d at 48 and quoting *Spoljaric*, 708 S.W.2d at 435). Intent tends to be a fact question uniquely within the realm of the trier of fact because it so

depends on credibility of witnesses and the weight given their testimony. *Spoljaric*, 708 S.W.2d at 434. However, evidence "so weak that it creates only a mere surmise or suspicion" of intent not to perform "constitutes no evidence." *T.O. Stanley Boot Co.*, 847 S.W.2d at 222.

Because CP Chem's denial of the promise is insufficient to demonstrate intent not to perform, Kingwood CrossRoads cites no evidence that, coupled with CP Chem's failure to perform, constituted "slight circumstantial evidence" and created more than "mere surmise or suspicion" of intent not to perform. *Cf. Chapa*, 212 S.W.3d at 305–06 (holding some evidence supported verdict that dealer fraudulently induced vehicle buyer to sign contract promising premium model where dealer's personnel subsequently "snatched" it from buyer and must have destroyed it later, signatures on at least four documents were forged, including forgeries of her deceased husband's signature, and dealer delivered base-model vehicle).

Furthermore, while Mawdsley was employed by CP Chem, the parties were still attempting an amicable resolution with ELDI, and a decision on whether to litigate was not yet necessary. Mawdsley had already left the company when other CP Chem employees declined to sue ELDI. As the person who purportedly made the promise, it was Mawdsley's intent that was relevant to the fraud issue because Kingwood CrossRoads cites no evidence that any of the other CP Chem employees who subsequently declined to sue ELDI authorized or participated in the promise or were aware of the promise when it was made. *See Formosa Plastics*, 960 S.W.2d at 48 (stating that evidence must be relevant to promisor's intent when representation was made). In short, Mawdsley did not fail to perform even if such a failure coupled with his denial of

the promise could have constituted evidence of intent not to perform.

▮ Additionally, Kingwood Cross-Roads cites no evidence that any of these other CP Chem employees knew of Mawdsley's promise at any subsequent time. In fact, after Mawdsley left the company, Arlen Allison asked whether he ever made such a promise. Mawdsley responded that litigation was discussed but there was never a promise suit would be filed. Kingwood CrossRoads cites an e-mail generated by Allison shortly after Mawdsley left CP Chem setting forth various options for resolution of the annexation issue, including "Litigation (I would like to have updated legal opinion on potential to prevail and estimated litigation cost.)." We disagree that referencing litigation as an *option* demonstrates an understanding by Allison that Mawdsley had already agreed to pursue this option. Consequently, the evidence showed that, at most, CP Chem's subsequent denials of Mawdsley's alleged promise were mistakes as opposed to deliberate attempts to disavow a known promise. Therefore, none of CP Chem's statements or actions when declining to sue ELDI constituted evidence of fraud even if their statements or actions could have been relevant to Mawdsley's intent when he made the promise.

Accordingly, the trial court erred by awarding $2.5 million in fraud damages against CP Chem. We sustain CP Chem's second issue.

## VI. ATTORNEYS' FEES

ELDI, CP Chem, and Kingwood Cross-Roads all appeal various attorney-fee awards.

### A. ELDI's Appeal

ELDI challenges the trial court's award of $1,029,817.25 in attorneys' fees to Kingwood CrossRoads for prosecuting its action for a declaratory judgment that the property is not annexed.

▮ Attorneys' fees are not recoverable in Texas unless allowed by statute or the parties' contract. *Chapa*, 212 S.W.3d at 310–11; *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex.1992). The Texas Declaratory Judgment Act ("the Act") provides, "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Ann. § 37.009 (West 2008). "The [Act] entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex.1998).

ELDI proffers several reasons for reversal of the attorney-fee award: (1) the declaration that the property is not annexed was substantively erroneous; (2) the trial court endorsed a double recovery by assessing these fees both directly against ELDI and as fraud damages against CP Chem; (3) by assessing these fees against both parties yet capping Kingwood Cross-Roads's total recovery, the court did not identify which defendant must pay first and which defendant benefits from the cap; (4) the trial court failed to require proper segregation; and (5) the award is not equitable and just.

▮ ELDI advances the following arguments to support its "equitable and just" contention: (1) any declaration regarding annexation was improper if CP Chem successfully challenges specific performance because Kingwood CrossRoads is relegated to the role of "mere bystander" relative

to status of the property and such declaration becomes meaningless; (2) any declaration regarding annexation was improper even if we uphold the specific-performance order because the property remains restricted by the DCC & Rs, which was Kingwood CrossRoads's primary reason for opposing annexation and; (3) regardless of whether a declaration regarding annexation was proper, ELDI prevailed on the declaratory-judgment issue it "cared about"—whether the property was restricted—and on Kingwood CrossRoads's claim for damages. In essence, ELDI states it would "welcome" reversal of the declaration, but its sole purpose on appeal is obtaining reversal of the attorney-fee award.[15]

A declaratory judgment is appropriate only if a justiciable controversy exists concerning the rights and status of the parties and the controversy will be resolved by the declaration sought. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex.1995) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993)). "To constitute a justiciable controversy, there must exist a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." *Id.* If declaratory relief will not terminate a controversy between parties and would be irrelevant at the time judgment is rendered, a declaratory judgment will amount to no more than an advisory opinion, which the trial court lacks power to provide. *Kenneth Leventhal & Co. v. Reeves*, 978 S.W.2d 253, 259 (Tex.App.-Houston [14th Dist.] 1998, no pet.).

Because the trial court erred by ordering specific performance, Kingwood CrossRoads retains no interest in a determination regarding status of the property. Consequently, there is no longer any justiciable controversy regarding status, and the trial court's declaration was merely advisory. We make no decision on the merits of the annexation issue but hold only that the trial court erred by rendering any declaration regarding annexation.[16] Consequently, we cannot conclude it was equitable and just to award attorneys' fees to Kingwood CrossRoads for prosecuting its declaratory-judgment action against ELDI.

Kingwood CrossRoads maintains the award was just because the entire case centered on the annexation dispute. Based on our disposition of the specific-performance order and resulting conclusion that any declaration regarding annexation is advisory, the only remaining actions against ELDI were Kingwood CrossRoads's claims for damages. We

---

**15.** Kingwood CrossRoads argues ELDI waived its challenge to the declaration because its two stated issues challenge attorneys' fees and sanctions without mentioning the declaration. However, in its "Table of Contents" and substantive argument, ELDI clearly challenges the declaration as a sub-issue of its attorney-fee issue. Therefore, we construe ELDI's challenge to the declaration as a subsidiary question "fairly included" in the issues presented. *See* Tex.R.App. P. 38.1(f); *GP II Energy, Inc. v. Chamberlain, Hrdlicka, White, Williams & Martin*, No. 14–07–00237–CV, 2008 WL 4354931, at *6 n. 8 (Tex.App.-Houston [14th Dist.] Aug. 26, 2008, no pet.) (mem. op.) (treating arguments as subsidiary questions fairly included in listed issues although arguments did not match issues presented).

**16.** Arguably, for the same reason, the trial court erred by rendering any declaration on whether the property is subject to the DCC & Rs. However, Kingwood CrossRoads is the only party who attacks this declaration, and its challenge is based on the merits and not, of course, on any contention that a declaration was meaningless. Accordingly, we will leave intact the declaration regarding the DCC & Rs.

recognize that the annexation dispute was significant with respect to precipitating the failed transaction because First American refused to issue a policy with no annexation exception based merely on existence of the dispute. However, we do not necessarily agree that Kingwood CrossRoads's claims for damages depended on whether the property was actually annexed. Nevertheless, the jury found in ELDI's favor on all these claims for damages, except conspiracy to commit fraud and negligent misrepresentation. However, attorneys' fees are not recoverable for prosecuting a fraud or negligent-misrepresentation claim. *See Chapa*, 212 S.W.3d at 304 (citing *New Amsterdam Cas. Co. v. Tex. Indus.*, 414 S.W.2d 914, 915 (Tex. 1967)); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West 2008) (setting forth claims for which attorneys' fees are recoverable).

 Therefore, absent a specific-performance order necessitating a declaration regarding status of the property, awarding Kingwood CrossRoads attorneys' fees against ELDI for proving non-annexation is tantamount to awarding fees on (1) claims for damages on which Kingwood CrossRoads did not prevail, and (2) claims for damages on which it did prevail (albeit offset by settlement credits) but for which attorneys' fees are not recoverable under Texas law. Accordingly, we conclude that the trial court abused its discretion by awarding attorneys' fees against ELDI on the declaratory-judgment action. We sustain ELDI's first issue.

## B. CP Chem's Appeal

CP Chem challenges the attorney-fee awards to Kingwood CrossRoads of $2,942,335 for prosecuting its breach-of-contract action against CP Chem and $1,912,517.75 for prosecuting the declaratory-judgment action.

### 1. Contract Action

A party "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8). Our court has held that a "valid claim" under this statute is not limited to an action for monetary damages and may include an action for specific performance. *See Rasmusson v. LBC PetroUnited, Inc.*, 124 S.W.3d 283, 287 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (citing *Jones v. Kelley*, 614 S.W.2d 95, 96, 100–01 (Tex.1981)). Further, the contract provided,

> If [Kingwood CrossRoads or CP Chem] is a prevailing party in any legal proceeding brought under or with relation to this contract or this transaction, such party is entitled to recover from the non-prevailing parties all costs of such proceeding and reasonable attorney's fees. This Paragraph ... survives termination of this contract.

Kingwood CrossRoads did not prevail on a valid contract claim for damages because of the jury's finding on impracticability. *See Chapa*, 212 S.W.3d at 314 (recognizing that, for purposes of recovering attorneys' fees, a party must overcome all affirmative defenses to prevail on a contract claim). Additionally, in light of our conclusion discussed above, Kingwood CrossRoads did not prevail on a valid claim for specific performance.

 Kingwood CrossRoads argues that we may uphold the award of its attorneys' fees because it successfully defended against CP Chem's breach-of-contract counterclaim. The judgment reflects that the trial court assessed attorneys' fees against CP Chem relative to breach-of-contract actions only for Kingwood CrossRoads's prosecution of its own claim.

Nonetheless, " '[w]e must uphold a correct lower court judgment on any legal theory before it, even if the court gives an incorrect reason for its judgment.' " *In re Wells,* 252 S.W.3d 439, 446 (Tex.App.-Houston [14th Dist.] 2008, orig. proceeding) (quoting *Guaranty County Mutual Ins. Co. v. Reyna,* 709 S.W.2d 647, 648 (Tex.1986) (per curiam)); *accord In re Estate of Jones,* 197 S.W.3d 894, 901 (Tex. App.-Beaumont 2006, pet. denied). Kingwood CrossRoads submitted a proposed judgment that was broader than the judgment ultimately rendered and would have encompassed recovery of fees for successful defense of CP Chem's contract action.

Section 38.001(8) does not authorize recovery of attorneys' fees for successfully defending a contract claim. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8); *Thottumkal v. McDougal,* 251 S.W.3d 715, 719 (Tex.App.-Houston [14th Dist.] 2008, pet. denied). However, the above-quoted contractual provision entitling a "prevailing party" to recover attorneys' fees does not distinguish between successful prosecution and successful defense of a claim. Therefore, we may uphold the trial court's determination that Kingwood CrossRoads is entitled to some fees because it successfully defended CP Chem's breach-of-contract counterclaim.

■■ However, CP Chem also raises an issue regarding segregation of Kingwood CrossRoads's fees. If any attorneys' fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. *Chapa,* 212 S.W.3d at 313. "[I]t is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14. The judgment reflects the trial court determined that segregation was not required relative to its other attorney-fee awards or alternatively the awards should be reduced by five percent if an appellate court determines segregation was required. However, because the trial court did not specifically award fees for Kingwood CrossRoads's successful defense of CP Chem's contract claim, the court issued no finding on whether segregation of those fees is required.

■■ Accordingly, we may not merely affirm the entire attorney-fee award based on Kingwood CrossRoads's successful defense of this claim. Instead, we remand for Kingwood CrossRoads to segregate these fees or demonstrate segregation is not required and for the trial court to determine the amount of fees recoverable for defense of CP Chem's contract claim. We sustain, in part, and overrule, in part, CP Chem's third and sixth issues.

### 2. Declaratory–Judgment Action

■■ CP Chem argues (1) the evidence is legally and factually insufficient to support the $1,912,517.75 award to Kingwood CrossRoads because its attorney attributed only $11,000 of the fees to prosecuting the declaratory-judgment action against CP Chem, and (2) the award is not equitable and just. This second contention is based in part on CP Chem's argument that Kingwood CrossRoads obtained no meaningful relief against CP Chem on the declaratory-judgment action. We agree with this second argument.

Specifically, Kingwood CrossRoads's attorney testified that it named CP Chem as a party to the declaratory-judgment action primarily because it held title to the property and questioned whether it was a necessary party. Indeed, irrespective of our disposition regarding specific performance and resulting conclusion that any declaration relative to the annexation status was improper, there was no justiciable controversy between CP Chem and Kingwood

CrossRoads relative to the annexation issue. CP Chem was not the party with authority to confirm non-annexation; rather, before the transaction failed, Kingwood CrossRoads sought ELDI's confirmation to conclusively resolve the issue. ELDI, not CP Chem, has maintained that the property is annexed, and CP Chem took no position at trial on this issue. If Kingwood CrossRoads were to purchase the property, any dispute over its status would lie between ELDI/the Association and Kingwood CrossRoads.

Nonetheless, as we have discussed, Kingwood CrossRoads has no interest in obtaining any declaration regarding annexation because it is not entitled to specific performance. Thus, there is no longer any justiciable controversy, much less between Kingwood CrossRoads and CP Chem, regarding annexation, and the trial court erred by rendering its declaration. Accordingly, we conclude the trial court acted beyond its discretion by finding assessment of attorneys' fees against CP Chem was "equitable and just" as required under the Act to sustain such an award. Similarly, to the extent that the parties' contractual provision allowing recovery of attorneys' fees would encompass "prevailing" on a declaratory-judgment action relative to the annexation status, Kingwood CrossRoads is no longer a "prevailing party."

Kingwood CrossRoads contends CP Chem's unfulfilled promise to litigate the annexation issue against ELDI "makes it equitable and just to have CP Chem shoulder those fees, regardless of the extent of CP Chem's participation at trial" on the issue. To the contrary, awarding Kingwood CrossRoads attorneys' fees under the Act on this basis would be tantamount to its recovering (1) damages for breach of a promise that was unenforceable under contract law pursuant to the statute of frauds, and (2) fraud damages despite legally insufficient evidence of fraud.

Kingwood CrossRoads also contends it is entitled to recover fees against CP Chem under the Act because Kingwood CrossRoads was required to prove the property was not annexed to defeat CP Chem's impracticability defense. We do not necessarily agree that resolution of the impracticability issue depended on a determination regarding the status of the property relative to annexation. Regardless, we have upheld the impracticability finding. Consequently, awarding Kingwood CrossRoads attorneys' fees for proving the property was not annexed relative to the impracticability defense would be tantamount to awarding its fees for prosecuting a contract claim on which CP Chem prevailed.

In sum, we hold that the trial court abused its discretion by assessing attorneys' fees against CP Chem on Kingwood CrossRoads's declaratory-judgment action. We sustain CP Chem's fifth issue and need not consider its fourth issue.

## C. Kingwood CrossRoads's Appeal

Kingwood CrossRoads appeals the award to CP Chem of $1.2 million "as a prevailing party in the contract action and as a just and equitable award" under the Act.

With respect to the "contract action," Kingwood CrossRoads cites CP Chem's failure to prevail on its own theories for affirmative relief. However, because CP Chem indeed did not prevail on its own contract claim, the award was necessarily predicated on its successfully defending, in part, Kingwood CrossRoads's contract action; despite ordering specific performance, the trial court clearly decided that CP Chem's successful defense of the claim for damages rendered it "a" prevailing party.

Kingwood CrossRoads contends CP Chem was not entitled to attorneys' fees even if we uphold the impracticability finding because "prevailing party" for purposes of awarding attorneys' fees means "a party who successfully prosecutes an action or successfully defends against an action on the main issue." *See Emery Air Freight Corp. v. Gen. Transp. Sys., Inc.,* 933 S.W.2d 312, 316 (Tex.App.-Houston [14th Dist.] 1996, no pet.), *disapproved of on other grounds by Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.,* 256 S.W.3d 660 (Tex.2008). According to Kingwood CrossRoads, CP Chem's impracticability defense was a "fragment" of the case and immaterial to the main issue: "who was entitled to the Property[?]"

We disagree that determining which party was entitled to the property was *the* main issue and that the impracticability defense was immaterial because it precluded Kingwood CrossRoads from recovering more than $4 million in breach-of-contract damages. Regardless, in light of our conclusion that the trial court erred by ordering specific performance, CP Chem is now the prevailing party on Kingwood Cross-Roads's entire contract claim, including the issue of which party is entitled to the property.

Kingwood CrossRoads also argues it cannot be characterized as a "non-prevailing party" because the jury found it "utterly blameless." We acknowledge that the jury found no fault on Kingwood Cross-Roads's part relative to the failed transaction. Nonetheless, the contract entitled a party to recover attorneys' fees for successful defense of a claim.

Finally, we need not address whether CP Chem is entitled to recover fees under the Act, as determined by the trial court. Kingwood CrossRoads does not argue on appeal that CP Chem was required to segregate its fees if we uphold the attor-

ney-fee award on only one ground cited by the trial court. Rather, Kingwood Cross-Roads argues that the award is erroneous on both grounds (contract and declaratory-judgment actions). Accordingly, we will uphold the entire award because CP Chem successfully defended the contract action. We overrule Kingwood CrossRoads's third issue.

## VII. Sanctions Against ELDI

### A. Background

The sanctions arose from a dispute about electronic discovery relative to the annexation issue. Approximately a week before filing suit, Kingwood CrossRoads requested that ELDI preserve all internal e-mails, as well as e-mails between ELDI and CP Chem, First American, the Association, and ELDI's predecessor, pertaining to the subjects at issue in this case. During discovery, Kingwood CrossRoads requested that ELDI produce "[a]ll e-mail communications of" six named ELDI employees "relating or referring to the [ELDI]/Chevron Contract, the Annexation, the Property, the Sales Contract, Blenheim Corporation, or Keith Stone."

Based on the deposition testimony of one ELDI employee, Kingwood Cross-Roads began questioning whether ELDI had fully responded to its request. King-wood CrossRoads further questioned ELDI's discovery responses when King-wood CrossRoads received the Association's responses reflecting that, at a February 23, 2005 meeting, it approved a proposal by ELDI whereby the Association would waive prior assessments in exchange for CP Chem's agreement the property is annexed. The Association sent the minutes reflecting this approval to ELDI's counsel. Kingwood Cross-Roads contends this evidence was vital to its position on the annexation dispute be-

cause any 2005 agreement to effect annexation reflected that both ELDI and CP Chem recognized the 1994 attempt was invalid.

Kingwood CrossRoads contends ELDI produced no minutes of the meeting except for a handwritten note on an agenda, but the Association's discovery responses included e-mails about the meeting which should have existed on ELDI's servers. Although ELDI suggests Kingwood Cross-Roads merely complains ELDI failed to produce duplicates of e-mails that Kingwood CrossRoads obtained from the Association, Kingwood CrossRoads emphasizes that ELDI's failure to produce these e-mails indicated it may have possessed other e-mails for which it failed to search or deleted after a litigation hold should have been placed.

Kingwood CrossRoads filed a motion to compel a search for the e-mails. On December 5, 2005, the trial court signed an order ("the order"), ruling as follows:

> [ELDI] shall conduct a further search of its e-mails, under the supervision of an independent third-party experienced in the discovery of electronic information, including all e-mails that may be stored on servers, back-up tapes, or otherwise. . . . Within three days of the date of this Order, Kingwood CrossRoads shall tender to ELDI the identities of three independent individuals/entities to perform this search, and within three days thereafter, ELDI shall select one to do the actual search, and if ELDI fails to select one such third-party within three days, Kingwood CrossRoads shall select one such third-party from the list of three. The expense of such search shall be borne by ELDI . . .

From Kingwood CrossRoads's proposed third-parties, ELDI chose Dr. Larry Leibrock of eForensics.[17] Leibrock became ill shortly before the search began, so a colleague assumed his responsibilities, but Leibrock was involved in pertinent initial discussions relative to parameters of the search. ELDI hired its own experts, the LIT Group and Baker Robbins Company, to perform the search. The search was conducted in January 2006.

Subsequently, Kingwood CrossRoads filed a "Motion to Show Compliance With Order Compelling E–Discovery Or, In the Alternative, Motion for Sanctions," complaining that ELDI's search was inadequate. The trial court ordered the parties to conduct discovery from third-parties who participated in the search and then appear before a discovery master to resolve their disputes. After extensive discovery, more wrangling, and further attempts to resolve the dispute with the master, Kingwood CrossRoads filed a renewed motion for sanctions, with numerous exhibits attached, arguing ELDI violated the order based on the manner in which it conducted the search.

At a pre-trial hearing, the court found that ELDI violated the order, announced its intent to impose monetary sanctions in an amount to be determined later, and deferred a decision on submitting a spoliation instruction to the jury. During trial, ELDI stipulated to the amount of Kingwood CrossRoads's reasonable attorneys' fees—$637,612.50—relative to the discovery issue although it reserved the right to appeal the decision to impose sanctions. After close of evidence, the trial court announced it would assess these fees as sanctions but not submit a spoliation instruction. The court remarked that it spent considerable time deliberating the

---

17. The name of this company was subsequently changed to "CyberForensics," but we will refer to it as "eForensics" throughout this opinion.

issue, thoroughly reviewed authority on the standards for assessing sanctions, and did not make its decision "lightly." In the judgment, the court stated the sanctions of $637,612.50 were based on violations of its orders and the Texas Rules of Civil Procedure.[18]

**B. Analysis**

After notice and hearing, a trial court may sanction a party who disobeys an order to provide or permit discovery. *See* Tex.R. Civ. P. 215.2(b). We employ an abuse-of-discretion standard to review a trial court's imposition of discovery sanctions. *Cire v. Cummings,* 134 S.W.3d 835, 838 (Tex.2004) (citing *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex. 1986); *Downer,* 701 S.W.2d at 241).

Kingwood CrossRoads contends ELDI violated the order through numerous actions: (1) preventing the independent expert from playing any substantive role, much less a supervisory role, in the search; (2) refusing to search back-up tapes; (3) knowingly destroying back-up tapes; (4) supplanting the independent expert's role through use of "captive" consultants not permitted under the order; (5) misleading the independent expert into believing it was ELDI's "captive" consultant; (6) manipulating search terms to impair effectiveness of the search; (7) failing to search alternative forms of electronic storage media (such as flash drives); (8) concealing its actions from the discovery master and the trial court; (9) submitting an affidavit to the court claiming the search would cost ELDI millions of dollars when the actual cost to preserve relevant e-mails would have been $300; and (10) failing to preserve all relevant e-mails in response to Kingwood CrossRoads pre-suit request.

ELDI contends the trial court abused its discretion by imposing sanctions because (1) ELDI did not violate the order, (2) it was at least "substantially justified" in its construction of the order, and (3) the amount was too severe for the alleged wrongdoing.

The court's comments at the sanctions hearing indicate it found violations of the order because ELDI, rather than the independent expert, performed the search, ELDI refused to search back-up tapes, and ELDI copied over back-up tapes. However, oral comments made by a trial court do not substitute for findings of fact and conclusions of law, and the court did not issue findings and conclusions. *See In re W.E.R.,* 669 S.W.2d 716, 716 (Tex.1984) (per curiam); *Huang v. Don McGill Toyota, Inc.,* 209 S.W.3d 674, 679 (Tex.App.-Houston [14th Dist.] 2006, no pet.). Moreover, in reviewing a sanctions order, we are not bound by a trial court's findings of fact and conclusions of law; rather, we must independently review the entire record to determine whether the trial court abused its discretion. *Am. Flood Research, Inc. v. Jones,* 192 S.W.3d 581, 583 (Tex.2006) (per curiam). Therefore, we may uphold the sanctions based on any violation of the order that has support in the record. *See id.*

We conclude the record supports a finding that ELDI violated the order by at least refusing to search back-up tapes and usurping the role of the independent expert. With respect to its substantial-justification argument, ELDI contends there were several alternative manners in which to construe the trial court's order; thus, even if it violated the order as intended by the court, its interpretations

18. The court also awarded attorneys' fees if Kingwood CrossRoads prevails in an appeal of the sanctions. ELDI does not challenge these fees independent of its attack on the sanctions as a whole.

were reasonable under the circumstances. ELDI's first and second arguments are somewhat interrelated; therefore, with respect to the two violations on which we uphold the sanctions, we will discuss together the issues concerning "substantial justification" and the alleged violation.

### 1. Refusal to Search Back-up Tapes

Kingwood CrossRoads contends the most flagrant violation of the court's order was ELDI's refusal to search backup tapes. Leibrock testified ELDI's in-house counsel handling the search was "highly argumentative," "uncooperative," and "strident." Before the search began, counsel resisted Leibrock's attempts to establish a "protocol" for searching back-up tapes, stating, "We're not doing any backups. This is a waste of time and a waste of money." [19] In response, Leibrock protested, "That's what the court order says." We hold that the trial court did not abuse its discretion by finding ELDI violated the order when it unequivocally announced its refusal to perform an action required under the order.

ELDI's primary argument on appeal is that the order was unclear on whether the trial court required an "ordinary search" for e-mails or an extraordinary forensics search for deleted e-mails. ELDI cites Texas Rule of Civil Procedure 196.4, which governs electronic discovery:

> To obtain discovery of data or information that exists in electronic or magnetic form, the requesting party must specifically request production of electronic or magnetic data and specify the form in which the requesting party wants it produced. The responding party must produce the electronic or magnetic data

that is responsive to the request and is reasonably available to the responding party in its ordinary course of business. If the responding party cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested, the responding party must state an objection complying with these rules. If the court orders the responding party to comply with the request, the court must also order that the requesting party pay the reasonable expenses of any extraordinary steps required to retrieve and produce the information.

Tex.R. Civ. P. 196.4. As ELDI asserts, the order does not mention "extraordinary" steps or "deleted" e-mails or require Kingwood CrossRoads to pay the costs of any forensic search. ELDI argues it was therefore justified in construing the order as not requiring ELDI to search for deleted e-mails, which it characterizes as "dumpster diving," i.e., a search through the trash. ELDI also contends that any search of back-up tapes would simply have duplicated the search of the servers.

These complaints would have been more appropriately presented before the trial court signed the order or in a request for reconsideration. However, this appeal is from the trial court's finding that ELDI failed to comply with the order as written. The order did require a search for "back-up" e-mails. Accordingly, ELDI's complaints regarding the breadth of the order do not establish the trial court abused its discretion by finding that ELDI disregarded the order.

### 2. Usurpation of Independent Expert's Role

19. The counsel at first said, "We don't have any backups." However, by then stating, "We're not doing any backups," she seemed to indicate backups might have existed but ELDI refused to search them. Even ELDI seems to acknowledge in its brief that backups existed because, rather than claiming there were no such tapes, it contends a search of back-ups would have duplicated a search of the server.

ELDI's primary contention regarding any usurpation of the independent expert's role is that its conduct was substantially justified based on its interpretation of the order. When transmitting its proposed third-party experts, Kingwood CrossRoads listed companies "to perform the Court ordered search." ELDI also received a proposed confidentiality agreement for one such company, but it was drafted so that the company and Kingwood CrossRoads were the parties thereto.

ELDI wrote to the trial court requesting clarification regarding who was required to perform the search and explaining that any confidentiality agreement should operate between the third party and ELDI, as the party possessing confidential information. ELDI's letter included the following:

> We do not believe that the Order contemplates that the outside company will perform the search, but instead we read the Order to compel [ELDI] to conduct a further search under the supervision of the company selected.

> We believe that [Kingwood CrossRoads] has been given the opportunity to basically select three companies to oversee a search by [ELDI], paid for by [ELDI], and that any [confidentiality] agreement should and must be between [ELDI] and one of the companies selected by [Kingwood CrossRoads].

The court replied that the second above-cited paragraph accurately reflected the order.

At the sanctions hearing, the trial court remarked it had specified in the order that the expert must actually conduct the search: "There is no question in anybody's mind, including [ELDI's], that I wanted an independent company to do the search. To say otherwise is a mockery." The court characterized the first above-quoted paragraph in ELDI's clarification letter as "Wrong, Dead wrong. Not even close." According to the court, by previously responding it agreed with the second paragraph in ELDI's letter, it clarified that "there will be an independent party supervising [ELDI's] required additional search; but obviously, the independent company was to do the search."

We agree with ELDI that the order did not clearly specify that the expert must perform the search because it contained two somewhat conflicting sentences: *"[ELDI] shall conduct* a further search of its e-mails, *under the supervision of an independent third party* ..." (emphasis added); and "Kingwood CrossRoads shall tender to ELDI the identities of *three independent individuals/entities to perform this search,* and within three days thereafter, *ELDI shall select one to do the actual search."* (emphasis added). Based on the first above-cited sentence identifying the actual action required of ELDI under the order, we conclude ELDI was justified in believing it could perform the search under the expert's supervision. Further, the trial court's response to ELDI's clarification request did not clearly instruct that the expert was to physically perform the search. Instead, by agreeing with the second above-quoted paragraph in ELDI's clarification request, the court suggested ELDI could physically perform the search as long as it was supervised by the expert.

Nonetheless, Kingwood CrossRoads's complaint is not that ELDI, rather than the independent expert, physically performed the search. As Kingwood CrossRoads asserts, it is immaterial "who was sitting at the keyboard" during the search. Instead, Kingwood CrossRoads primarily complains that ELDI prevented the expert from even exercising a supervisory role. Notwithstanding any lack of clarity in the order and the trial court's e-mail concern-

ing who was required to physically perform the search, the court definitely required the expert's supervision. ELDI obviously recognized this intended role because the parties executed a Rule 11 agreement that the search would commence on a certain date and continue to conclusion "under the supervision and oversight of" Dr. Leibrock. Because we may consider the entire record when evaluating the decision to sanction ELDI, we will evaluate Kingwood CrossRoads's complaint that ELDI usurped the expert's supervisory role.

Leibrock testified that ELDI's in-house counsel resisted Leibrock's request to meet with ELDI's "IT" staff and his efforts to establish a "protocol," which he deemed necessary to the search. Counsel stated that the protocol was "unacceptable" and "way too expensive" and "there's nothing here anyway." According to Dr. Leibrock, counsel generally insisted the search would be "done [ELDI's way]," stating "[t]his is Exxon's data. We know how to search these particular systems." These comments are contrary to the court's ordering a search supervised by an independent expert because ELDI's previous search had allegedly been inadequate. Moreover, it became clear to Leibrock that ELDI simply wanted eForensics to act as "observer," not "supervisor." To Leibrock, "supervision" meant generating the search terms, which eForensics did not do.

Additionally, an employee of LIT Group suggested that ELDI's attorneys decided the search terms. An internal e-mail from a LIT Group consultant stated, "eForensics ... will strictly serve as a witness to the process."

Another eForensics representative, Randall Casey, testified that the contract presented by ELDI contemplated eForensics would serve as ELDI's expert and was not a contract his company would execute when hired as a court-ordered neutral. He signed the contract because, based on his conversation with ELDI's counsel, he thought the company was being hired as ELDI's expert rather than a court-ordered neutral. ELDI and its counsel led Casey to believe that eForensics was to serve solely as observer of other disinterested third parties (Baker Robbins and the LIT Group), as opposed to supervisor. In sum, we conclude that some evidence supports a finding that ELDI usurped the intended supervisory role of the independent expert.

### 3. Amount of Sanctions

Finally, ELDI contends that $637,612.50 is an excessive sanction and unjust relative to the alleged misconduct. At one point in its brief, ELDI states it "will honor its factual stipulation about the reasonableness of" the fees, but later seems to challenge the amount of sanctions. According to ELDI, its stipulation about the amount of reasonable and necessary fees relative to the discovery dispute did not equate to an agreement that awarding this amount was appropriate as a sanction.

However, the trial court did not sanction ELDI under subsections (1) through (7) of rule 215.2(b), which set forth various degrees of sanctions a court may order "as are just," ranging from assessing costs to striking pleadings. *See* Tex.R. Civ. P. 215.2(b)(1)-(7). Instead, the trial court applied only subsection (8), which provides,

> In lieu of any of the foregoing orders or in addition thereto, the court *shall* require the party failing to obey the order or the attorney advising him, or both, to pay, at such time as ordered by the court, the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other

circumstances make an award of expenses unjust.

*Id.* 215.2(b)(8) (emphasis added).

■ We acknowledge that the amount of sanctions is significant. However, because ELDI agreed to reasonableness of the amount and we uphold the trial court's finding that ELDI violated the order, our inquiry is confined to addressing whether the trial court abused its discretion by awarding attorneys' fees, and we do not evaluate the amount in comparison to the misconduct. *See id.* We have rejected ELDI's argument that its interpretation of the order was substantially justified with respect to the above-discussed violations. We further conclude the trial court did not abuse its discretion by determining an award of attorneys' fees was just because some evidence indicated ELDI failed to produce all requested e-mails on a subject, the order was rendered to aid in discovery of the e-mails, and ELDI made known at the outset of the search that it did not intend to fully comply with the order. We overrule ELDI's second issue.

### VIII. CONCLUSION

We reverse Paragraphs 1, 5, 6, and 8a of the trial court's judgment and render judgment that Kingwood CrossRoads take nothing on its fraud claim against CP Chem and on its request for attorneys' fees against CP Chem and ELDI for Kingwood CrossRoads's prosecution of its declaratory-judgment action.

We reverse Paragraph 4 of the judgment and render judgment that Kingwood CrossRoads take nothing on its request for attorneys' fees against CP Chem for Kingwood CrossRoads's prosecution of its breach-of-contract claim; but we remand for determination of the amount of attorneys' fees Kingwood CrossRoads is entitled to recover for its defense of CP Chem's breach-of-contract claim.

We reverse Paragraph 9 of the judgment and render judgment denying Kingwood CrossRoads's request for a declaratory judgment that the property is not annexed or alternatively that, if the property is annexed, ELDI and the Association waived, or are estopped from enforcing, their rights under the Annexation Document.

We reverse Paragraph 11 of the judgment and render judgment denying Kingwood CrossRoads's request for an order requiring specific performance of the contract.

We affirm the remainder of the judgment.

(SULLIVAN, J., not participating.).[20]

---

**20.** Justice Sullivan was assigned to the panel for this case and participated during oral argument. However, he subsequently resigned from the court and did not participate in deciding this case. *See* Tex.R.App. P. 41.1(b) ("After argument, if for any reason a member of the panel cannot participate in deciding a case, the case may be decided by the two remaining justices.").